## LESTRADE v. BARTH.

WHERE an equitable defense is set up to an action of ejectment, the defendant becomes an actor with respect to the matter presented by him, and his answer must contain the essential averments of a bill in equity. The defense must meet the present claim of the plaintiff to the possession; and in order that an equitable defense may avail, the equity presented must be of such a character that it may be ripened, by the decree of the Court, into a legal right to the premises, or such as will estop the plaintiff from the prosecution of the action.

The equitable defense should be first passed upon by the Court; and it is irregular to submit to the jury all the legal and equitable defenses together.

*Arguello* v. *Edinger* (10 Cal. 160) and *Weber* v. *Marshall* (19 Id. 447) give the rule.

In this case, although the matter constituting the equitable defense was submitted to the jury and a general verdict rendered for defendant, yet as no objection was raised to this course of proceeding either in the Court below or here, the irregularity was not considered in the determination of the appeal.

Courts of Equity have jurisdiction to correct an error in any material particular of a written agreement, either executory or executed, so as to make the instrument conform to the intention of the parties. And it matters not whether the error be in the insertion or omission of a material stipulation, or in an inaccurate description of the subject matter of the agreement. Nor does it make any difference whether the error be the result of fraud in one of the parties, or be committed under a mutual mistake, contrary to the intention of both parties.

Lestrade *v.* Barth.

Where, in ejectment, plaintiff and defendant deraigned title from one Bennett, who died in August, 1849—plaintiff claiming by deed from Bennett's heirs, and defendant by deed to his grantors from Bennett himself in March, 1849, which latter conveyance misdescribed the premises—and defendant set up in his answer as an equitable defense this sale by Bennett to defendant's grantors prior to Bennett's death, the mistake in the description and knowledge of the sale, and the mistake on the part of plaintiff when he purchased from the heirs: *Held,* that the defense was good, and that the necessary parties were before the Court; that in a direct suit brought by defendant to have this mistake corrected and a deed made to him, plaintiff only (and not the heirs of Bennett) would be a necessary party.

The form in which relief will be given, when a mistake in a material particular is established in a written agreement, depends upon the circumstances of the particular case. Courts of Equity have a wide discretion in such matters, the object being to give parties the same beneficial result which would have flowed from the agreement had the mistake never existed.

In this case, had the equitable defense been first passed on, the Court would have decreed a conveyance by plaintiff to defendant, and also an injunction against the further prosecution of the action.

As in this case, relief from the consequences of the mistake in the description of the premises sold by Bennett to defendant's grantors is sought in equity; evidence of Bennett's declarations, and conduct in fencing the lot, in locating his own building and of his agreement as to a partition wall between himself and such grantors, was admissible to show the mistake.

Where the correction of a mistake in a written instrument is sought in equity, the evidence as to the mistake must be clear and convincing, and not loose, equivocal or contradictory, leaving the mistake open to doubt.

Where defendant was in the open, notorious and exclusive possession and occupation of a town lot, having valuable and lasting improvements thereon, under deeds from the original owner to his grantors, and these deeds so misdescribed the lot as not to pass the legal title: *Held,* that such possession and occupation were sufficient to put plaintiff, who was a subsequent purchaser of the title of the heirs of B., upon inquiry as to the interest, legal or equitable, which defendant had in the premises; that such inquiry should have been made of defendant, and that if plaintiff failed to make it, he is entitled to no more protection in his purchase than if he had inquired and ascertained the real facts.

APPEAL from the Fourth District.

Ejectment for a lot in San Francisco, commencing at a point on the north side of Pacific street one hundred and sixty-seven and one-half feet westerly from the north-west corner of Kearny and Pacific streets, and running west twenty-seven feet eight inches by a depth of one hundred and thirty-seven and one-half feet, being a part of fifty vara lot, No. 48, on the map of said city.

The following diagram shows the position of the lot:

Lestrade *v.* Barth.

WEST.

DUPONT STREET.

66

137 1-2 Feet.

137½

PACIFIC STREET.

NORTH.

1 foot 2 inches front.

Lot occu- pied by dft. 30 ft. front.

48

261-2 ft.

Lot in dispute.

Lot de- scribed in complaint. 27 2-3 feet.

Line of old fence.

Ft.

261-2 ft.

30 feet.

44

137 1-2 Feet.

KEARNY STREET.

EAST.

The pleadings are stated in the opinion of the Court.

At the trial, plaintiff read in evidence a stipulation, wherein it was admitted by defendant that Vardeman Bennett was the original grantee and owner of fifty vara lot, No. 48, on the plan of the town and city of San Francisco, including the premises sued for, and that both parties claim under said Bennett as the common source of title.

2d. That Bennett died in August, 1849, seized in fee of this fifty vara lot, No. 48, subject to a sale of a portion thereof to Serrine by deed dated March, 10th, 1849.

3d. That all the heirs of Bennett since his decease, and before this suit was commenced, have conveyed to plaintiff by deed *all their right, title, estate and interest* at the date of said deeds in and to the fifty vara lot, No. 48, whereby the plaintiff became and is possessed of such interest.

4th. That the land in dispute in this action lies on the north line of Pacific street, one hundred and sixty-seven and one-half feet west of the west line of Kearny street.

5th. That the defendant was in possession at the commencement of this action.

Here plaintiff rested.

Defendant, to maintain his defense, offered in evidence a deed of conveyance dated March 10th, 1849, from Bennett to George W. Serrine, and mesne conveyances from Serrine down to himself (the defendant). The land so conveyed by the deed from Bennett to Serrine is described therein as "the eastern part of the lot of land, No. 48, on the plan of the town of San Francisco, containing thirty feet on Pacific street, and running back fifty varas, being the eastern portion of said lot of land," etc. All these deeds under which the defendant claims were for a valuable consideration paid by the several grantees.

Defendant then introduced Ellis as a witness, who testified, among other things, that he was of the firm of Salmon & Ellis in 1849; that they purchased of Serrine in July, 1849, part of lot No. 48, (producing their deed); that they erected thereon a substantial store in front and sheds in the rear; that there was an old fence

dividing the lot they occupied from the lot on the east, the fence being their eastern boundary, and that Bennett had improvements on the lot to the west of them. A paper was here shown witness, and after its execution was duly proved, was read to the jury under plaintiff's exception that it was *res inter alios.* The paper was as follows:

" SALMON & ELLIS WITH VARDEMAN BENNETT:

" Whereas, the above named parties are owners of a certain lot of ground situated on the northern part of Pacific street, on the plan of the town of San Francisco, containing thirty feet on Pacific street and running back fifty varas, being the eastern part of said lot No. 48, and as said Salmon & Ellis are now about to erect a building on one portion of their lot, it is mutually agreed between us to build a party wall on the division line of their respective lots, that is, one-half of the wall on Mr. Bennett's lot and the other half on Salmon & Ellis' lot. It is further agreed that Vardeman Bennett will be entitled to use the party wall when he desires to do so, upon his paying one-half of its cost.

(Signed)                          " SALMON & ELLIS,
                                                        his
                                   " VARDEMAN X BENNETT."
                                                        mark

The witness continued: The building was put up in pursuance of this agreement, the party wall being built on the western line of our lot, which was thirty feet front.

Defendant then called Jasper O'Farrell, who testified in substance as stated in the former report of this case in 17 Cal. 287.

Green testified, that he bought fifty vara lot No. 44, adjoining lot No. 48, on the east, in June, 1849; that at that time there was a small house on the west part of lot No. 44, as then fenced in by a picket fence; that Salmon & Ellis' lot was close to his western division fence, and that they lived there several years; that lot No. 44 was fenced in twenty-five to thirty feet too far west, and that when he sold he had his lot surveyed, and that this survey developed the error; that before he sold he extended his fence some twenty-six and a half feet east, which gave him fifty varas east and west, and

this original twenty-six and a half feet besides; and that this balance he never claimed afterwards.

Brannan testified, that Bennett, in 1849, occupied the middle fifty vara lot on the north side of Pacific street, between Kearny and Dupont; that the lot was enclosed and had a house on it, Bennett always claiming that his house was on lot No. 48; that Bennett was living on the lot in 1846; that in 1846–7 a public meeting of citizens was held, and a resurvey of the town determined upon—people injured by any consequent removal of fences to be indemnified by the city; that Bennett as well as Smith, his neighbor, was present, and both protested against the resurvey; that the resurvey was made by O'Farrell, and lot No. 48, as fenced and located, found to be twenty-six to thirty feet too far west; that neither Smith nor Bennett would remove, and that the lot remained in the same condition until Smith sold out and Bennett died; that he, witness, was administrator of Bennett's estate after Thompson, the former administrator, left; that while administrator he paid the debts of the estate and turned the property over to the widow; that Smith's lot on the east, where Bennett's house was, fell into other hands, and they claimed it; that this part of lot No. 48, where Bennett's improvements were, was deeded in exchange for part of lot No. 66, adjoining No. 48 on the west, and that the widow Bennett knew of the exchange; the children were minors in 1850.

Plaintiff objected to that part of the testimony relative to Bennett's occupying and claiming the lot on which he lived as part of lot No. 48, as to the mistake and the resurvey, etc., on the ground that it was hearsay, *res inter alios*, and representations in favor of his own interest and contradictory to the calls of his deed to Serrine. Overruled and exceptions taken.

Sherreback testified, that Bennett, in 1844, built a house on the west part of the middle lot, on the north side of Pacific street, between Kearny and Dupont; enclosed the lot with a picket fence running along Pacific street fifty varas, and that part of the fence was there in the beginning of 1850; that Bennett had a bowling alley built of wood on Smith's lot, an adobe house, and a liquor saloon twenty-five or thirty feet front.

Felt testified, that Salmon & Ellis built a wooden house in 1849

43

on Pacific street, which they occupied until the fire of June, 1851, after which they rebuilt on the same lot; thinks there was a fence on Kearny street.

Eaton testified, that he had known the part of lot No. 48, occupied by Salmon & Ellis, since 1850; that their lot commenced twenty-six and one-half feet west of one hundred and thirty-seven and one-half feet from Kearny, and ran thence west about thirty feet; that down to 1855 Gray owned twenty-six and one-half feet of such lot, and that witness collected rent of S. & E. for Gray—the last lease being for three years.

Van Allen testified that he had collected rent on the lot in controversy for Salmon since April, 1857, and that defendant bought the lot of Salmon.

Chonoi testified that Salmon occupied the lot in 1849. Salmon built an adobe house.

Fish testified that he first knew the lot in controversy in 1850, and that Salmon then occupied it; that witness had charge of it for Salmon from 1853 to 1855; that Gray had the lot adjoining on the east, for a piece of which Salmon paid Gray rent, and when the lease was out, Eaton, who was Gray's agent, paid Salmon for the buildings on Gray's lot. The whole front of the lot was covered with buildings.

Tobin testified that when Barth (defendant) bought of Salmon & Ellis, in 1857, they gave him the deeds to draw from, but that witness inserted the description by metes and bounds in feet and inches of his own motion, as more definite than to describe it as the thirty feet of the easterly part of lot number forty-eight.

Defendant then introduced the petition and order for the appointment of John Thompson as administrator of the estate of Bennett, which papers were produced from the records of the Court of First Instance, sitting as a Probate Court, now in the custody of the County Clerk of the city and county of San Francisco. The petition was by Mary Bennett, the widow, representing the death of her husband in August, 1849; that the deceased left real and personal estate in that city; that there were minor and other children, and that she declined the trust in favor of Thompson.

Plaintiff objected to both papers, on the grounds that they were

Lestrade v. Barth.

*res inter alios,* that the Court had no jurisdiction, and that the heirs of Bennett were not made parties.   Overruled, and exceptions taken.

Defendant then introduced in evidence a petition, (and the consequent order) by the administrator, to the Court of First Instance, stating, among other things, that Bennett died seized of fifty-vara lot number forty-eight, and that petitioner, as administrator, has been in possession thereof, as he supposed; but that by a decree of this Court in the case of *Gray* v. *Patterson,* it was decided that the latter was occupying twenty-six and one-half feet of ground belonging to Gray, being a portion of lot number sixty-six, on the corner of Pacific and Dupont streets, and adjoining the lot of Bennett; that by the decree Patterson was ordered to vacate said property, and to remove his buildings, and to occupy twenty-six and one-half feet of ground commencing from the most easterly part of the lot then occupied by him—that is, to occupy twenty-six and one-half feet on the most westerly part of lot number forty-eight, hitherto occupied by petitioner, as administrator aforesaid; that the result would be great loss and expense to the estate in the removal of buildings owned by it, and on the easterly part of lot sixty-six; that Gray had compromised his suit by agreeing to make Patterson a deed of the twenty-six and one-half feet of lot sixty-six, if he (Patterson) would make petitioner a deed of twenty-six and one-half feet of the ground on which petitioner, as administrator, was located, petitioner to execute a deed to Gray of twenty-six and one-half feet of the most easterly portion of lot forty-eight.   Prayer that petitioner be authorized to carry out the compromise.

Ordered accordingly, on the twenty-sixth of January, 1850. To these papers plaintiff objected as last above.   Same rulings and exceptions.

Subsequently, Brannan, as administrator of Bennett's estate, filed a petition reciting the order last named, and that he, in July, 1850, as administrator, and in pursuance of the order, executed to Gray a deed of the most easterly twenty-six and one-half feet of lot forty-eight in exchange for a deed to him, as administrator, of twenty-six and one-half feet of the most easterly part of lot sixty-six; that to effect this exchange petitioner had agreed to pay to

Lestrade *v.* Barth.

Gray a bonus of three hundred dollars, and that this was necessary to save litigation, etc.    Prayer that he be authorized to pay said sum.

Ordered accordingly.

Petition and order, and Gray's receipt for the money, introduced in evidence.

Brannan's final account and discharge were then read in evidence.

Defendant then introduced certain deeds of portions of lot forty-eight in evidence not necessary to be stated, and finally offered in evidence : first, the petition of Mary Bennett, the widow, and the adult heirs, praying for partition and distribution of certain real estate ; second, the order of Court dated June 20th, 1855, appointing commissioners to make partition ; third, their report setting apart : 1st. To the widow, a lot commencing one hundred and nine feet ten inches from the north-east corner of Dupont and Pacific streets—on the north side of Pacific—running thence east sixty feet and five five-eighth inches on Pacific, thence right angles north one hundred and thirty-seven and one-half feet, thence at right angles west sixty feet and five five-eighth inches, thence southerly one hundred and thirty-seven and one-half feet to Pacific street ; 2d. To seven of the children of Bennett named, a lot commencing at a point on the northerly line of Pacific, one hundred and seventy feet and three five-eighth inches from the north-east corner of Dupont, and running easterly on Pacific forty-seven feet and three-eighth inches, thence northerly at right angles one hundred and thirty-seven and one-half feet, thence westerly forty-seven feet and three-eighth inches, thence southerly one hundred and thirty-seven and one-half feet to the place of beginning ; fourth, order of Court confirming the report.

Plaintiff objected as before ; overruled and exceptions.

It was admitted that defendant was in the actual possession and occupation of the demanded premises at the time plaintiff purchased of the heirs ; that the O'Farrell survey in 1847 made no change in the plan or map of San Francisco, and that all the maps from that time to the present are the same, and that the only effect of the new survey was to develope the erroneous location on the ground

Lestrade *v.* Barth.

by Bennett of lots forty-four and forty-eight, and that lots sixty-six, forty-eight and forty-four, adjoining each other from east to west, are fifty-vara lots.

Defendant rested.

Plaintiff then moved the Court to withdraw from the jury all the evidence introduced by defendant, and to instruct them that there was no evidence warranting a verdict for defendant, on the grounds: first, that there was no evidence of such an equitable title in defendant as could defeat plaintiff's legal title; second, that admitting such equitable title had been shown, still there was no evidence that plaintiff had either actual or constructive notice thereof at the time of his purchase from the heirs of Bennett.

Motion denied, plaintiff excepting.

The Court instructed the jury:

1st. That if Bennett, at the time he conveyed the eastern part of lot forty-eight to Serrine, represented to him that the picket fence on the eastern side of said lot was the eastern line of the same, and Serrine believed it, and paid the consideration, and received the conveyance under that belief, both Bennett and his heirs are estopped to deny it, although it was not the eastern boundary line of said lot according to the map or plan of the town, or the calls of the deed; and that the defendant claiming under Serrine has such an equitable title to the demanded premises as can defeat the plaintiff's action, if he had notice of it.

2d. That although there is nothing in the record of the chain of deeds from Bennett down to defendant, or in the Probate proceedings, which imparted constructive notice to the plaintiff of the equitable title of defendant to the demanded premises, yet the fact that the defendant was in the actual possession and occupation of the lot in controversy at the time the plaintiff purchased from the heirs of Bennett was sufficient constructive notice of defendant's equities to put the plaintiff on inquiry in regard to them.

To the latter part of which plaintiff excepted.

Plaintiff requested the Court to instruct the jury: first, that there is no proof that plaintiff had notice, actual or constructive, of any equitable estate in defendant at the time of his purchase from the heirs, and must therefore find for plaintiff; second, that the

possession by defendant at the time of plaintiff's purchase was not of itself notice to him of any existing equitable title in defendant, and that plaintiff took the estate discharged of all such equities, if any existed; third, that whether such possession was notice or not of defendant's equities, still the proofs fail to disclose such an equitable title in defendant as can defeat the legal title of plaintiff.

Refused, and exceptions taken.

Verdict for defendant; judgment accordingly. Motion for new trial overruled, and plaintiff appeals.

*Holladay & Cary,* for Appellant.

*H. P. Hepburn,* for Respondent.

FIELD, C. J. delivered the opinion of the Court—NORTON, J. concurring.

This is an action of ejectment to recover the possession of certain premises situated in the city of San Francisco. The complaint is in the ordinary form. Both parties deraign title from the same source—from Vardeman Bennett, to whom an Alcalde grant of lot designated No. 48 on the map of the city, embracing the premises in controversy, was issued in 1847. Bennett died in August, 1849; and the plaintiff claims by conveyance from his heirs, and upon the evidence produced by him presents a *prima facie* case entitling him to recover. To the action the defendant by his amended answer— filed by stipulation between the parties since the case was before this Court at the January term, 1861—sets up an equitable defense, alleging, in substance, that in March, 1849, Bennett sold the premises now in the occupation of the defendant to one Serrine, and that in July following, Serrine sold them to Salmon & Ellis, under whom the defendant claims; but that in the conveyance from Bennett to Serrine an erroneous description of the premises was given, the error arising from a mistake made as to the location of the eastern line of the lot No. 48; that from this mistake the premises were described as "the eastern part" of the lot containing thirty feet in front on the street, and running back fifty varas—whereas, in fact, the premises were twenty-six feet and six inches from the

true eastern line ; that this mistake was common to the neighborhood, and was made by the owners of the adjoining lots ; that it arose originally with Bennett in taking possession and inclosing his lot ; that the consequent misdescription has continued through all the intermediate conveyances from Serrine to the present occupant ; and that the plaintiff took his deed from the heirs with actual notice of the sale of the premises by Bennett, and of the subsequent sales down to the one to the defendant, and of the error ·in the description contained in the several conveyances.    The answer concludes with a prayer that the defendant may be adjudged the owner of the premises, and that the plaintiff be decreed to convey them to him by a good and sufficient deed, and for general relief.

Under our system of practice, equitable defenses may be interposed to the action of ejectment ; that is to say, a defendant may set up in his answer such matter as would, if presented by a bill in equity, entitle him to affirmative relief against the action.    But as we have had frequent occasion to observe, the defendant in such cases becomes an actor with respect to the matter presented by him, and his answer must contain all the essential averments of a bilľ in equity.    The defense to an action of ejectment must meet the present claim of the plaintiff to the possession ; and in order that an equitable defense may avail, the equity presented must be of such a character that it may be ripened, by the decree of the Court, into a legal right to the premises, or such as will estop the plaintiff from the prosecution of the action.    The equitable defense should, therefore, be first passed upon by the Court, as according to the determination of the claim of the defendant to the relief he seeks will the necessity of proceeding with the action at law depend.    (*Arguello* v. *Edinger*, 10 Cal. 160 ; *Estrada* v. *Murphy*, 19 Id. 248 ; and *Weber* v. *Marshall*, Id. 447.)    This is the proper practice in such cases, for it serves to keep the equitable and legal matter distinct, and to prevent what would otherwise frequently ensue—confusion and embarrassment in the progress of the action.    We had occasion to refer particularly to this subject in the case of *Weber* v. *Marshall*.    We there held that it was irregular to submit to a jury all the legal and equitable defenses together.    " It does not by any means follow," we said, " that a jury must be called to pass upon

an equitable defense to an action of ejectment. The parties are entitled to a trial by jury upon the legal issues ; but the Court, sitting to administer equitable relief, either by way of defense to an action of ejectment or affirmatively, sits as a Chancellor, and, in the exercise of equitable powers, may or may not order an issue or issues to a jury in its discretion ; but in a great majority of cases, the Judge can as well pass upon the facts as a jury, and may do so with a great deal less delay and expense. It is only when the evidence is very contradictory, and the question turns on the relative credibility of witnesses, or in such exceptional instances, that the Chancellor calls in the aid of a jury to assist him in sifting and ascertaining the facts."

In the present case, the matter constituting the equitable defense was submitted to the jury, and a general verdict rendered for the defendant. This mode of proceeding was irregular, but as no objection was taken to it in the Court below or raised in this Court, we will not give to the irregularity any influence in the determination of the appeal. We have called attention to it, as it is desirable that the practice when once settled should be uniformly followed.

The questions on the merits are : 1st, whether the equity asserted by the defendant is sufficient to justify a decree giving him affirmative relief against the action ; and 2d, whether the evidence produced in the case establishes that equity.

1. The equity asserted is, that the premises occupied by the defendant were the premises sold and intended to be conveyed, and that there is an error in their description in the several conveyances, and its sufficiency for the relief sought depends upon the point whether the necessary parties are before the Court. The jurisdiction of Courts of Equity to correct an error in any material particular of a written agreement, either executory or executed, so as to make the instrument conform to the intention of the parties, is well settled. And it matters not whether the error be in the insertion or omission of a material stipulation ; or, as alleged in the present case, in an inaccurate description of the subject matter of the agreement. Nor does it make any difference whether the error be the result of fraud in one of the parties, or be committed under a mutual mistake, contrary to the intention of both parties. "A Court

Lestrade *v.* Barth.

of Equity," as justly observes Mr. Justice Story, "would be of little value if it could suppress only positive frauds, and leave mutual mistakes, innocently made, to work intolerable mischiefs, contrary to the intention of parties. It would be to allow an act, originating in innocence, to operate ultimately as a fraud, by enabling the party who receives the benefit of the mistake to resist the claims of justice under the shelter of a rule framed to promote it." (1 Eq. Jurisp. sec. 155 ; see also 1 Sugden on Vendors, ch. 3, sec. 11 ; *Townshend* v. *Stangroom*, 6 Ves., Jr. 328 ; *Henkle* v. *Royal Assurance Co.*, 1 Ves., Sen. 319 ; *Hunt* v. *Rousmaniere's Administrators*, 1 Pet. 12 ; *Gillespie* v. *Moon*, 2 John. Ch. 586 ; *Tilton* v. *Tilton*, 9 N. H. 392 ; *Peterson* v. *Grove*, 20 Maine, 363 ; *Clopton* v. *Martin*, 11 Ala. 187 ; *Beardsley* v. *Knight*, 10 Ver. 190 ; *Goodell* v. *Field*, 15 Id. 448 ; *Bailey* v. *Bailey*, 8 Hump. 230.)

The inquiry then is, whether the necessary parties are before the Court to justify the exercise of its equitable jurisdiction in the present case. The answer setting up an equitable defense, being in the nature of a bill in equity, must, as we have stated, contain all its essential requisites. Such defense can as a consequence only be interposed where the parties to the action are such as would be required to a bill in equity seeking the same relief. We are of opinion that the plaintiff is the only person who would be deemed an indispensable party defendant, upon the facts alleged in the answer set forth in an independent suit for the correction of the misdescription of the premises. Upon the facts alleged, the heirs of Bennett never possessed in their own right any estate in the premises occupied by the defendant. That estate had been sold by their father, though the legal title did not pass, from the error in the description of the premises, in the conveyance given. They were at best only trustees of the legal title, holding it for the purchaser from their father, or those claiming under him, and bound to transfer it whenever requested. The plaintiff receiving, according to the allegations of the answer, the conveyance from the heirs, with knowledge of the sale and error in the description, took the legal title subject to the same trust, and bound by a like obligation to transfer it when called upon for that purpose. And it is not per-

ceived that any good end would be subserved by uniting the heirs as parties with him in a suit to enforce such transfer. No decree could pass against them, either in favor of the defendant or as between them and the plaintiff. Taking the conveyance according to the answer, with knowledge of the facts of the case, the plaintiff could not ask a decree against the heirs for reimbursement of any moneys paid as a consideration for the conveyance, or for any other purpose. The proper parties being, then, before the Court, the defendant was entitled, upon proof of the equity asserted by him in the amended answer, to relief against the action. Whether that equity was established by the evidence produced is another matter, which we shall hereafter consider. The form in which relief will be given, when a mistake in a material particular is established in a written agreement, must necessarily depend upon the circumstances of the particular case. Courts of Equity have a wide discretion in such matters, their object being to give parties the same beneficial result which would have flowed from the agreement had the mistake never existed. In the present case, that object would have been effected by a conveyance from the plaintiff, and had the equitable matter presented been first heard by the Court, according to what we have indicated to be the proper practice, a direction for such conveyance would undoubtedly have been embodied in the decree, pursuant to the prayer of the answer. And as the execution of the conveyance would have taken from the plaintiff any right to proceed with the action of ejectment, a provision enjoining the further prosecution of the action might also have been inserted. In *Gillespie* v. *Moon* (2 John. Ch. 585) the description of the property by metes and bounds in the deed embraced a tract of fifty acres not intended to be included, and the Court relieved against the mistake by decreeing that the defendant release and convey the fifty acres to the plaintiff, with covenants against his own acts.

2. The second question for consideration is, whether the evidence produced by the defendant establishes the equity asserted by him. The evidence shows that Bennett sold and intended to convey, and the grantees purchased and believed they had received a conveyance of the premises occupied by the defendant. The repeated declarations of Bennett; his conduct in fencing the lot; the location of his

own building; and the agreement as to the partition wall between himself and Salmon & Ellis leave no doubt whatever on this point. They show a mistake on the part of vendor and purchaser as to the location of both the eastern and western lines of the lot, a mistake which affected the description of the premises in the first and all subsequent conveyances. The evidence of Bennett's declarations and conduct was admissible to show the mistake, relief from its consequences being sought by application to the equity jurisdiction of the Court. From the very nature of the case such evidence must be admissible, or mistakes in written agreements could in few instances be rectified. And so all the authorities hold. The evidence, it is true, must be clear and convincing, making out the mistake to the entire satisfaction of the Court, and not loose, equivocal or contradictory, leaving the mistake open to doubt. (See Story's Equity Jurisp. Secs. 152 to 159 inclusive, and the authorities there cited.) After the death of Bennett no claim was made, in the administration of his estate, to the premises occupied by the defendant. They were not treated as part of the estate, but on the contrary, the mistake in the location of the eastern line having been ascertained, that portion of the lot lying east of these premises was not considered as having been sold, but was disposed of for the benefit of the estate. And not until June, 1858, nearly nine years after the death of Bennett and the commencement of the present action, was any pretense put forth, so far as the record discloses, that the heirs retained in their own right any interest in the premises in controversy. Nor does it appear that the plaintiff gave any valuable consideration for the conveyance from the heirs. The conveyance only purports, according to the stipulation of the parties, to have passed all " their right, title, estate and interest " in the premises. But it is immaterial whether or not he did give such consideration. He took the conveyance with notice of the equitable interest of the defendant, and therefore subject to the right of the defendant to enforce such interest. It is true, the evidence does not sustain the allegation made in the answer of *actual* notice to the plaintiff of the sale of the premises by Bennett, and of the subsequent sales down to the defendant, and of the error made in the description contained in the several conveyances; it shows, however, a state of facts which

equally affected him.    The defendant was in the open, notorious and exclusive possession and occupation of the premises, having valuable and lasting improvements thereon.    This possession and occupation were sufficient to put the plaintiff upon inquiry as to the interest, legal or equitable, which the defendant held in the premises, and that inquiry should have been made of the defendant thus in possession and occupation.    If he failed to make this inquiry, he is not entitled to any more protection in his purchase than if he had inquired and ascertained the real facts of the case.    (*Hunter* v. *Watson*, 12 Cal. 363, and cases there cited, and *Pritchard* v. *Brown*, 4 New Hamp. 404.)    We are clearly of opinion that the equity asserted by the defendant in his amended answer is sufficiently established by the evidence, and that it entitled him to the affirmative relief he seeks.

The view we have taken of this case renders it unnecessary to notice in detail the several objections to the rulings of the Court below urged by the appellant.    Most of them are inapplicable when the equitable character of the defense is considered; and the others are sufficiently answered by the authorities we have cited.

Judgment affirmed.