[Sac. No. 2335.    Department Two.—August 6, 1917.]

GRINNEL BURT, Respondent, v. LOS ANGELES OLIVE GROWERS ASSOCIATION (a Corporation), Appellant.

Reformation of Contract—Mistake—Burden of Proof.—One who seeks the reformation of a contract on the ground of mutual mistake must show the mistake by clear and convincing evidence.

Id.—Sufficiency of Evidence.—In this action it was held that the evidence of the circumstances attending the execution of a contract for the sale of an olive crop was sufficient to justify the finding that there was no mistake warranting a reformation of the contract.

APPEAL from a judgment of the Superior Court of Butte County, and from an order denying a new trial. J. E. Barber, Judge.

The facts are stated in the opinion of the court.

Anderson & Anderson, and Jones & Jones, for Appellant.

J. M. McGee, for Respondent.

HENSHAW, J.—Plaintiff sued defendant to recover the price of olives purchased by defendant from plaintiff under a written contract. The agreement was made on the seventh day of July, 1913, and was between the parties to this action. It provided "that the party of the second part [defendant] does by these presents purchase all the crop of olives for the year 1913 growing on the trees situate on the following described real property: . . .

"That said party of the first part agrees to accept and the said party of the second part agrees to pay to the party of

the first part for all the Mission & Mansanillo olives grown on said orchard aforesaid during the year 1913, the sum of One Hundred and Forty Dollars ($140.00) per ton on the trees.

"That the party of the second part agrees to pick and harvest crop at its own expense as soon as said olives are in a condition to be harvested, i. e., when between red and purple in color, and to continue said work thereafter continuously until all are harvested.

"It is also agreed and understood that all windfalls or frosted olives shall count as part of the crop to be gathered and paid for as aforesaid; provided always that all olives harvested prior to December 7th, 1913, which are rendered unfit for pickling because of frost shall be paid for at the rate of Twenty-five ($25.00) Dollars per ton on the trees.

"It is further agreed and understood that all the olives remaining on the trees in said orchard aforesaid after January 15th, 1914, may be picked by the party of the first part at the cost and expense of the party of the second part, and be delivered at the factory of the party of the second part at Sylmar, California, at its own expense, and said party of the second part shall in addition thereto pay to the party of the first part for said olives aforesaid the sum of One Hundred and Sixty-five ($165.00) Dollars per ton."

The complaint charged for nonpayment under the terms of the contract of the value of many thousand pounds of olives harvested by defendant, and for a lesser quantity not harvested but left on the trees or as windfalls, payment for which it is alleged was due under the contract. It was further alleged that none of the olives which had been harvested prior to December 7, 1913, had been rendered unfit for pickling because of frost. Judgment was sought for the total amount of the value of these olives under the contract, amounting to $21,387.27, with interest and costs of suit. The answer admitted the execution of the agreement. It denied the total quantity of olives harvested under the contract and declared a lesser amount. It denied that any olives were left unharvested in the orchard, but alleged that all of the crop was gathered. It denied that none of the olives harvested prior to December 7th were rendered unfit for pickling by frost. As an affirmative defense it sought a reformation of the contract, alleging in brief that the true understanding and agree-

ment between the parties was that the plaintiff should bear all risk of frost and all damage occasioned by frost to all of the olives, provided such frost occurred prior to December 7, 1913, and that defendant should bear all risk of frost and all damage occasioned by frost if such frost occurred after December 7th, thereby meaning (to make the matter plain) that if the olive crop was totally destroyed by frost before December 7th, defendant would be called upon to pay nothing, whereas if it was not impaired by frost before December 7th, but was totally destroyed by frost occurring after December 7th, the defendant would be called upon to pay the full price of $140 per ton. It will be noted that the contract actually executed between the parties makes provision for reducing the price from $140 a ton to $25 a ton for only such olives as have been "rendered unfit for pickling because of frost," and which have been "*harvested* prior to December 7, 1913." The grounds upon which reformation was sought are that neither defendant nor its agent "noticed or observed the fact that said contract did not correctly set forth the intent and agreement of the parties, but, on the contrary, the said agent and this defendant, by reason of mistake and inadvertence when said contract was executed, believed the same did correctly set forth said agreement and executed said contract under such belief and mistake." It is further alleged that the plaintiff "undertook to draft the contract in accordance with the prior agreement between the parties," and "that the agent of the defendant relied upon the skill, ability, and fairness of the plaintiff to correctly draft said agreement, and by reason of his confidence in said plaintiff did not read said contract as carefully as he otherwise would have done." Still further it is alleged that the plaintiff at the time of the execution of the contract knew that the defendant and defendant's agent believed the contract correctly set forth the terms agreed upon in relation to the frost risk. And finally, upon the matter of reformation, the answer set forth nondiscovery of the mistake "until about December, 1913." The answer alleged that at the time of discovery a very large part of the olive crop was injured by frost occurring on or about November 28, 1913; that this frost reduced the contract price of these damaged olives from $140 a ton to $25 a ton, which defendant offered to pay. Under these issues trial was had. The court refused a reformation, found in favor of plaintiff,

and gave him judgment as prayed for.  From this judgment and from the order denying its motion for a new trial defendant takes this appeal.

On appeal its principal attack is directed against the findings denying a reformation.  It needs no citation of authority to the effect that in reviewing the attack upon these findings we need consider only whether there is substantial evidence supporting them and what that evidence is.  It may be summed up as follows: Plaintiff, an attorney at law, had recently acquired an olive orchard, the crop of which for the season of 1913 defendant was anxious to purchase, writing to plaintiff as early as June 20th of that year, ''We are very anxious to purchase your fruit and are willing to deviate our form of contract to any extent within reason to cover points that might be suitable to you.''  As these negotiations proceeded plaintiff wrote, expressing confidence in his own ability to ''draw up an acceptable contract.''  Defendant replied that it was ''willing to meet your views as to details and would be glad to have you draw up a memoranda of agreement such as you will be willing to sign and mail it to us for our acceptance.''  Later the defendant wrote, ''We await with pleasure your contract.''  Then on July 3d defendant wrote that it had ''a representative, Mr. Ryan,'' who would call on plaintiff, and expressed the hope that ''you will be able to close a deal with him.''  Mr. Ryan arrived, thus clothed with powers to enter into a contract for the purchase of plaintiff's olives, and the result of personal negotiations between him and plaintiff was the execution of the contract here sought to be reformed.  Mr. Ryan's power to execute the contract is not seriously questioned, and under the evidence cannot be.  There were other firms and corporations in the field buying olives for pickling and oil-making.  The price of olives was advancing.  Mr. Ryan was perfectly familiar with the business of contracting for the purchase of prospective olive crops.  There was a discussion between plaintiff and Mr. Ryan, as well as between plaintiff and Mr. Simonds, secretary of defendant, concerning the frost clause to be embodied in the contract, and upon this arises a conflict in the evidence. It appears that the olives in that section of the country had suffered severely in the season of 1911 from an unexpected and very unusual frost.  It appears still further that normally in that section an olive crop ripens and may be wholly

picked or harvested early in December. The substance of plaintiff's testimony is that he was willing to run the risk of and assume the damage occasioned by any frost occurring before December 7th, but that this damage was to be determined by an inspection of the harvested olives, as thus could be made certain the amount of damage which the olives had sustained, whereas it could be arrived at approximately only if the olives were still on the trees.

The testimony of defendant's witness, Ryan, the agent of defendant, authorized to enter into the contract, and Simonds, the secretary of the defendant, to whom the contract was sent for inspection and approval and who wrote many letters to plaintiff, is to the effect that they understood that the whole matter of difference between them and their corporation and plaintiff was over the *date* of the frost liability clause and not at all over the *terms* of the clause; that the terms were, and were understood to be, that for all damages to the olives occasioned by frost occurring before December 7th, plaintiff should bear the loss, whether the olives were picked or unpicked, and that for all damage occasioned by frost occurring after December 7th, defendant in like manner should bear the loss, in that it would be called upon to pay the full price of $140 per ton for these olives, even if their quality and value were thus impaired.

Here, manifestly, is a conflict in the evidence. But the argument of defendant's counsel is that the evidence of its two witnesses—Ryan, the agent, and Simonds, the secretary—establishes defendant's right to a reformation because the evidence on behalf of plaintiff given by himself must be utterly rejected, and it must be rejected because the plaintiff is a "Dr. Jekell and Mr. Hyde," who displayed "extraordinary gymnastic duplicity," "with utter disregard of the truth"; indeed, the picture drawn is that of a ravening wolf disguised under a delusive sheepskin, leading two innocent and confiding lambs into the thorny thicket of this contract, there turning on them, rending them and battening on their innocent bodies. Unfortunately, however, the picture lacks something of verisimilitude. True, Mr. Ryan testifies to a preliminary discussion with Mr. Burt at the latter's home, which discussion had to do with the frost date, and that after this was agreed upon as the 7th, they went together to the Oroville Chamber of Commerce, where Mr. Burt dictated the contract

to a stenographer, it was transcribed, signed by both parties, and forwarded to Mr. Simonds for his approval.  Mr. Burt's testimony is that he had prepared a draft of the contract with omissions as to prices and dates, precisely in the form of the executed contract; that this was typewritten by the stenographer of the Oroville Chamber of Commerce; that this typewritten blank form of contract was submitted to Mr. Ryan at plaintiff's home and discussed with him.  Its contents were agreed upon, its dates, the prices, and other like matters were there inserted, in the presence of Mr. Ryan, and together they went to the Oroville Chamber of Commerce, where he turned over this draft, asking the stenographer to prepare for him in typewriting three perfected copies, and that he dictated no word of it to her.  This evidence was corroborated by the stenographer herself.

The contract thus executed was sent to Mr. Simonds for his approval.  Mr. Simonds in turn must have read, indeed he admits that he read the frost clause of the contract.  The clause itself is brief and its meaning is expressed in plain and unambiguous English.  But he says that with his attention directed only to the date, which in the executed contract was December 7th, he struck out the 7th and substituted therefor the 10th of December, as giving the defendant more time for the gathering of the crop, and as decreasing defendant's liability to damage from frost and increasing plaintiff's liability.  He wrote to Burt on the 8th of July, before Burt had entered into any correspondence with him relative to the executed contract, saying, "We have the contract which you drew up." . . . "Relative to the date when the olives should be off the trees we have changed it to the 10th."  Plaintiff objected and the original date was restored.  On July 17th he wrote again: "If we are not too much handicapped by rainy weather and the fruit matures, we will have it all off by the date mentioned.  The extra three days would simply have given us that much more time in case of adverse conditions arising."  On July 10th he wrote to Burt that his inquiries indicated "that under years of normal temperature the freezing of your fruit would be reduced to a minimum."  And on July 16th he wrote again: "Relative to the frost situation would say that as far back as we have been able to procure any information in regard to the frosts in your district, we have found that there was only one year, which was

in 1911, that the frost arrived before the fruit was ready to harvest.'' As an instance of the artful deception which, according to appellant's counsel, was practiced by plaintiff upon the defendant through its secretary, Mr. Simonds, is this from a letter written by Mr. Burt on July 8th to Mr. Simonds: "The damaging fall frost of 1911 was unprecedented. While such frosts are damaging if before December 1st or so to so great a degree, yet I know smudging insures us both—me in particular, of course." Appellant's counsel finds in this a perfidious attempt to mislead defendant, and asks why, "if the intent and understanding was not as we contend and was as plaintiff now claims and the lower court finds," did he use this language, since it implied, as defendant understood, that all damage occurring by frost before December 7th should be borne by him.

But it would seem that a complete answer is that both parties contemplated that the crop would be harvested by or before December 7th, and that if so harvested and the harvested olives showed damages by frost, the loss would unquestionably fall on the plaintiff "in particular." It would unprofitably prolong this opinion to discuss all appellant's arguments against the weight of plaintiff's evidence. Upon the whole evidence the court took the not unreasonable view that the contract meant what it said; that it was a not unconscionable requirement that the olives frosted before December 7th, for which frosting a reduction in price was to be made, should be harvested for inspection, and that there was and in the nature of things could be no concealment of the language of a contract and no trick practiced upon two business men, agents, and officers of defendant, to both of whom the contract was submitted for inspection and approval.

Upon the law of reformation appellant contends that as its evidence shows that it did not understand that plaintiff was to sustain the loss of frost-damaged olives only as this might be disclosed after harvest, there was no meeting of minds upon the contract, and therefore it should be reformed. But the first difficulty with this position is that if there was no meeting of minds there was no mistake upon which equity could act by way of reformation. The reformation sought for under such circumstances would be the creation of a new contract between the parties and one which they never entered into, for plaintiff's position, supported by the written

contract itself, is that the latter expresses his own under-standing as well as the understanding of defendant. The only action open to the complaining party under such circumstances is an action not for reformation but for rescission. (*Ward* v. *Yorba,* 123 Cal. 449, [56 Pac. 58]; *Hochstein* v. *Berghauser,* 123 Cal. 684, [56 Pac. 547]; *Hearne* v. *Marine Ins. Co.,* 20 Wall. (U. S.) 488, [22 L. Ed. 395].) Where so solemn an instrument as a written contract is sought to be reformed for mistake, "evidence of the mistake must be clear and convincing, and not loose, equivocal, or contradictory leaving the mistake open to doubt." (*Lestrade* v. *Barth,* 19 Cal. 675.) Every presumption in equity favors the view that such a contract as this, thus deliberately entered into, expresses the true intent and meaning of the parties. The burden of showing the contrary is upon the party seeking to avoid its plain terms. Under this evidence it cannot be successfully contended that the mistake was mutual or that it was induced by plaintiff by the suppression of any term in the contract, or even that it was known to plaintiff, or suspected by plaintiff, that defendant did not understand its terms. Nothing in the writings of defendant to plaintiff after the execution of the contract so establishes, and plaintiff's own testimony is to the contrary. This testimony is aided by the legal duty imposed upon a party to read such a contract before executing it. (*Hawkins* v. *Hawkins,* 50 Cal. 558; *Metropolitan Loan Assn.* v. *Esche,* 75 Cal. 513, [17 Pac. 675]; *Pope* v. *Armsby Co.,* 111 Cal. 159, [43 Pac. 589].) And to the pleading and contention that these business men, dealing at arm's-length with plaintiff in the matter of this contract, reposed confidence in him, and had the right to repose confidence in him, because they consented to his drawing the contract, and therefore were excused from intelligently reading it, it may be answered, in the language of *Robins* v. *Hope,* 57 Cal. 497: "Certainly no relation is shown to have existed between him and them from which the law would infer confidence and influence." And finally upon this subject it should be said that while it is quite true, as declared in *Los Angeles & Redondo R. R. Co.* v. *New Liverpool Salt Co.,* 150 Cal. 21, [87 Pac. 1029], that the mere failure of a party to read an instrument with sufficient attention to perceive an error or defect in its contents will not prevent its reformation, this means no more than that when the cause

of this failure is satisfactorily explained to the court of equity, that court will hold that the explanation or excuse of the failure relieves from the charge of the neglect of a legal duty within the meaning of section 1577 of the Civil Code. The trial court in this instance manifestly took the view either that the failure to read the contract comprehendingly was not sufficiently explained and excused, or that in fact the contract was read comprehendingly and the defendant was but attempting to escape the consequences of a frost which it did not apprehend would occur, but which, having occurred, resulted in its injury. It is immaterial which of these two views the trial court in fact adopted. Either is sustainable under the evidence.

The second complaint of appellant is that this action was only tried upon the question of reformation and that the other matters upon which issue was joined were not tried, and that defendant to its injury was prevented from introducing upon those issues all of the testimony which it desired to present. The findings of fact declared the appearance of the parties by their attorneys at the time set for trial, the taking of the evidence of the respective parties before the court, its consideration of all of that evidence, and the arguments of counsel and the submission of the cause to the court for decision. It is not contended, nor can it successfully be contended, that evidence *pro* and *con* upon the issues (in addition to the issues tendered on the question of reformation) was not offered and admitted. Appellant's position is that it could and would have introduced more evidence if it had not in some, not very clearly defined, way been misled into the belief that it could at some subsequent time introduce such evidence.

Under the contract all the olives were to be paid for at the rate of $140 a ton, saving such olives harvested by or before December 7th as were shown to be unfit for pickling by reason of frost, which impaired olives were to be paid for at the rate of $25 a ton. Evidence was introduced by both sides on this issue—whether or not there had been a frost, whether or not the olives had been frosted, whether or not the shriveled condition of some of them was due to frost or due to drying winds, and plaintiff by this evidence manifestly established to the satisfaction of the court that the 19,821 pounds of olives harvested before December 7th were fit for

pickling, despite the conflicting evidence introduced by defendant.

Another issue was as to the quantity of olives left unpicked on the trees by defendant after January 15th. It will be noted that there is a permissive clause in the contract providing that after that date plaintiff may pick such olives and ship them to defendant, charging the cost of picking, packing, and shipping to defendant, and that for such olives so picked defendant was to pay $165 per ton. Issue was joined by the pleadings as to the amount of olives so left unpicked, the complaint charging that 21,559 pounds were so left, the answer denying this and alleging that defendant had picked the whole crop. On the trial plaintiff introduced evidence. showing that there were 21,559 pounds of olives left unpicked by defendant on his trees. The defendant's evidence was that of the witness whom it had employed to pick this olive crop. His testimony upon this point is as follows: "Q. Were there any olives left on the trees after you quit picking the fruit that were affected by the frost and that shriveled in that third picking? A. Yes, sir. Q. You did not pick all the frosted olives, then? A. No, sir." Defendant offered no further evidence as to the quantity of olives thus left unpicked, and the issue was thus tried and was determined in plaintiff's favor.

It is manifest that at the trial defendant's serious effort was necessarily directed to a reformation of the contract. Under that contract it could not reduce the price even of frosted olives if they were on the trees on December 7th, and under the contract defendant apparently had no evidence to countervail against that of plaintiff as to the quantity of olives which it actually left on the trees after January 15th. But under a reformation of the contract defendant could greatly reduce its liability by a showing, if it could make it, that the whole crop or a very large part of it was rendered unfit for pickling by reason of the frost, and this whether the olives were on or off the trees on and after December 7th. It appears that this was appreciated by the attorneys of both the litigants. Thus at one time the following colloquy took place between them:

"Mr. McGee (Appearing as counsel for plaintiff, to defendant's attorney): Have you any other witnesses?

"Mr. Anderson (Appearing as counsel for defendant): Yes; I have some witnesses here that I could put on out of order as to the condition of the orchard, but I understand that you will object to that testimony.

"Mr. McGee: I want a judgment on the contract before—

"Mr. Anderson (Interrupting): Before we pass on to the other matter.

"Mr. McGee: Yes. If the court upsets the contract we will go on then with the other testimony.

"Mr. Anderson: I think this is a proper position, and consequently we wish to put on our evidence as to the reformation feature before the rest."

This can be understood only as meaning that Mr. Anderson had evidence which would be pertinent touching orchard conditions after the court had adjudged his client to be entitled to a reformation. Again, after evidence had been taken by both sides regarding the temperature records as showing or not showing frost, Mr. Anderson declared: "So far as the reformation of the contract is concerned, that is our case, except in so far as we might have to put in rebuttal evidence on that subject, but in resting at this time we do it. with the understanding we had yesterday, that the question as to the injury to the olives and the cause of injury, and the damage if any, is to be left open in the event that we proceed further than this stage." It is difficult to understand this language as meaning anything other than that defendant had no further testimony, unless the case was opened for the introduction of it under a decree of court reforming the contract. And finally in a colloquy between court and counsel at the conclusion of the evidence, Mr. Anderson stated: "That closes the evidence on this branch of the case. What is your honor's desire as to the presentation of it?

"The Court: The court will listen to suggestions from counsel—how do you mean?

"Mr. Anderson: The presentation of argument on this branch of the case.

"Mr. McGee: Let us go on and finish it up and submit it to the court, and if the contract is upheld, it is ended, and if not, we will go on with the case.

"Mr. Anderson: In that event your honor will understand that this has been quite a long and exhaustive day. I would

like to meet at 9 o'clock and proceed with the argument, or at any hour that is agreeable.''

We cannot construe this as meaning anything other than that Mr. Anderson wholly assented to the view expressed by Mr. McGee and that the trial court was perfectly justified in so concluding.

Appellant's final contention is that were it not for what it asserts is plaintiff's ''extraordinary facility for falsehood,'' it would be ''amazed'' at his claim of a right to recover for that portion of the crop unharvested after January 15th. The contract provided that after January 15th the olives remaining on the trees ''may be picked by the party of the first part.'' On January 15th plaintiff wired defendant that after that date it had no right to pick the olives remaining; that he was entitled to the exclusive possession of his property, and was entitled to pick the olives himself at $165 a ton, payable by defendant; that he would permit defendant itself (as being a saving to defendant) to pick the remaining olives at the same price. The defendant replied, insisting upon its right to finish the picking of the olives ''within a reasonable time after January 15th, as the delay has been caused by causes beyond our control.'' To this, in turn, plaintiff replied that he would not change his previous offer. The evidence shows that after this telegraphic correspondence defendant did in fact pick some of the olives from the orchard with the permission of plaintiff. The evidence further shows, and the testimony has been quoted above, that defendant contended that it left none but frosted olives of the crop unpicked. The pleadings show that plaintiff was not insisting upon the $165 per ton, but only on $140 per ton, the regular contract price, for the quantity of olives which he established had been left unharvested. This asserted grievance is therefore without merit.

Wherefore the judgment and order appealed from are affirmed.

Melvin, J., and Lorigan, J., concurred.

Hearing in Bank denied.