### REIDY v. MYNTTI et al.

### MYNTTI et al. v. REIDY.

### No. 9446.

Circuit Court of Appeals, Ninth Circuit.

Dec. 30, 1940.

726

Henry Roden, of Juneau, Alaska, and R. F. Lewis, of San Francisco, Cal., for appellants Myntti et al.

J. Joseph Sullivan, of San Francisco, Cal., and John L. McGinn, of San Mateo, Cal., for appellant Reidy.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Action at law for damages claimed to have been suffered by reason of failure on the part of the defendants to account to plaintiff for rent or royalty due her under a lease of certain mining claims. Trial was had in the District Court for the Territory of Alaska before a jury, and the jury returned the following verdict: "We, the Jury * * do, from the law and evidence therein, find in favor of the plaintiff and against the defendant on the issues joined herein and that there is owing to the plaintiff from the defendants the sum of $9,375.00, plus $300.00 withheld, for royalty from mining operations during the years of 1936 and 1937, together with interest thereon." Judgment was entered in the sum of $9,675 with interest thereon from the date of the judgment at the rate of 6%. Both parties appeal. [28 U.S.C.A. § 225, as amended]. We shall discuss the two appeals separately, and for clarity shall refer to the parties as plaintiff and defendants throughout this opinion.

Defendants Myntti, Repo, Speljack and Mesich, copartners, entered into a lease with plaintiff, Ellen Reidy, on July 31, 1936, for a period of three years, covering mining property designated in the lease only as "Minnie Bench R. L., Yeager Bench R. L., and Gulch Fraction R. L., all situated above Discovery on Ganes Creek, tributary of the Innoko River in the Innoko Recording Precinct, Territory of Alaska." The defendants were to pay the plaintiff as rent or royalty 10% of all gold extracted up to

the value of $25,000, and 12½% of all gold extracted over that amount. The defendants went into possession of the leased premises and in 1936 mined gold to the extent of $62,000 in value from the Minnie Bench. Certain royalty was paid for this mining, which plaintiff claims lacks $300 of the amount which she should have received. In their answer defendants denied that the royalties were not all that were due to plaintiff, but no appeal is taken by defendants from the portion of the judgment awarding the $300. Plaintiff alleges that in 1937 the defendants conducted further mining operations on the leased property, and extracted gold the value of which was unknown to plaintiff. On information and belief she alleged that the value exceeded $75,000. No royalties on this mining were paid by defendants to plaintiff. Defendants deny that the 1937 mining operations were conducted on the properties covered by the lease. Whether or not the evidence sustains the finding that they were conducted on the leased premises is one question involved in the defendants' appeal. Another question raised by the defendants relates to the amount of the recovery.

Plaintiff testified that after her appointment as administratrix, she went to Ganes Creek to ascertain the location of the mining claims belonging to the estate. She took one Mike Roka, one of the original locators of Ganes Creek, to show her the location on the ground. He pointed out to her the stakes and lines bounding the claims. This testimony was admitted without objection on the part of the defendants. After Mike Roka had pointed out the stakes to the plaintiff, they went to the defendants' mess-house on Ganes Creek. Plaintiff testified that the defendant Myntti was there. Hanging on the wall was a copy of a map which we shall refer to as the "Thorne Map", another copy of which is one of the exhibits in this case, and shows the locations of the plaintiff's claims substantially as claimed by the plaintiff. Plaintiff, Myntti and Roka talked about the location of the plaintiff's claims, and defendant Myntti went to the map and showed plaintiff on the map the locations that plaintiff and Roka had been on just about ten minutes before.

We quote from the plaintiff's testimony: "Q. Now what—just tell the jury what Mr. Myntti—just show the jury what Mr. Myntti did with reference to that plat and what conversation took place between you at that time. A. * * * he put his finger right about there.

"Q. Where is your finger? A. Right on the Yeager Bench, on the valley of the Yeager Bench, telling me he knew John Griffin's ground, and this was one of his claims, the Yeager Bench, and told me about the boundary line between Discovery, and he owned half interest in Discovery."

Plaintiff further testified that between June 26 and July 16, 1936, she, assisted by Owen Gray, lined up the boundaries of the claims. They re-established the corners, tied white flags to the corner stakes, and marked the boundaries of the claims upon the ground so that they could be readily traced.

This was at the same time as the defendants and plaintiff were negotiating for the lease with which we are here concerned. The evidence is clear that the defendants knew of the lines as located by the plaintiff. Defendant Speljack was spokesman for the defendants in the negotiations for the lease, and plaintiff told him that "the stakes were lined up".

The lease was executed on July 31, 1936. Plaintiff and all of the defendants except Myntti were present. There were also present Mrs. Howard, the United States Commissioner, who acknowledged the instrument, and the witnesses Mrs. Grace M. Shaver (now Mrs. Eric Hard) and Evan Jones. We quote from the testimony of the plaintiff on this point: "Before she [the U. S. Commissioner] swore me in I asked those partners, Speljack, Mesich, and Repo, if they were accepting this lease as it read * * that they were taking the ground as the lease read and that they were also taking the ground as I had lined up the stakes, and Mr. Speljack, being the spokesman for them, says, 'We can't go back on the stakes', and I signed the lease." This testimony was corroborated by Mrs. Eric Hard.

In July, 1937, Robert Lyle, a civil engineer and mineral surveyor, was employed by plaintiff to survey the claims. He made the survey exactly as the stakes were shown to him by plaintiff on the ground. Plaintiff and Lyle at that time visited the cabin of Charles Goebel, who had been familiar with Ganes Creek since 1908, and Charles Goebel pointed out the tract. Robert Lyle made a map of his survey which was introduced into evidence. Lyle's survey coincides with plaintiff's claims as to the boundaries in the present action. All of Lyle's

testimony, with the exception of the introduction of the map prepared by him, was admitted without objection.

Defendants claim, however, that the Thorne map and the Lyle map are incorrect. It is certain that the mining operations conducted by the defendants in 1937 were outside the lines which they claim are the correct boundaries of the leased premises, and within the boundaries claimed by plaintiff.

Defendants' first specification of error is that "the only testimony before the Court as to the actual location on the ground of the leased mining claims was that the plaintiff, with the assistance of one or two others, undertook to lay out the lines without any real knowledge of the facts"; and "that whatever information the plaintiff and her witness had was based on what was told to her and to them".

 There are two simple answers to this specification of error. The first is that the testimony of the plaintiff and her witnesses was admitted without objection. The authorities are clear that statements of witnesses, even though based on hearsay, constitute competent evidence unless seasonably objected to as hearsay. Clark v. McNeill, 6 Cir., 1928, 25 F.2d 247. The second answer is that the possible hearsay objection would not defeat the testimony as establishing that the plaintiff distinctly marked the boundaries of the claims as contended by her upon the ground, and that the defendants accepted these boundaries as correct at the time the lease was executed. This testimony if believed by the jury would constitute an admission by the defendants that the boundaries of the claims are as claimed by the plaintiff. In this connection the trial court quite properly instructed the jury that in deciding what the boundaries of the leased premises were on the date of the execution of the lease they "should take into consideration all of the evidence admitted in the case, including admissions against interest by any of the parties as to such boundaries, if any such admissions have been proven". This instruction has not been questioned by the defendants.

 Defendants next specify as error the admission into evidence of the so-called Lyle's map. We quote from defendants' brief: "Uncontradicted testimony shows map was based on statements made to the surveyor Lyle by plaintiff and Goebel, and no competent evidence was introduced by plaintiff to explain how the surveyor fixed the lines of the various claims shown on the map. The uncontradicted evidence is that all plaintiff or Lyle knew was what they were told." It is argued here, too, that the hearsay evidence was inadmissible. We answer this latter argument as in the first specification of error—the evidence, with the exception of the map itself, was not objected to in the trial court, and having been admitted without objection is now competent evidence in the cause.

As to the question of the admissibility of the map, a reading of the testimony discloses that one of the purposes for its introduction was to explain the testimony of the witness. He testified that he made the survey in accordance with the stakes as shown to him on the ground. The map tended to illustrate the witness' testimony as to just where those stakes were located. It is not even argued by the plaintiff that the map is of itself evidence of the true boundaries of the claim. It merely goes to prove the location of the stakes, as pointed out to the witness. It should be recalled again that the testimony as to the location of the stakes was not objected to as hearsay, and the map being illustrative of the testimony, prepared by the witness himself, was admissible.

The point is made by the defendants that the witness Lyle admitted that he got the location of one of the stakes from a map supposed to have been made by a man named Thorne. [This Thorne map is the same one to which we have hereinbefore referred]. Here again the answer is that no objection was made at the trial as to the possible hearsay character of this evidence, and it cannot be raised now for the first time on appeal.

 Defendants' third specification of error relates to the refusal of the trial court to admit in evidence certain copies of location notices. Two notices were involved. One was a notice signed by one Ney Yeager purporting to claim property known as "Yeager Bench claim", dated July 10, 1907. The other was signed by one T. J. Mickle, purporting to claim property known as "No. 1 above discovery", and was dated February 14, 1907.

Several grounds of objection to the introduction of these notices were urged at the trial—that they were irrelevant and immaterial to the issues of the case, that they

were too remote and did not tend to prove the boundaries of the claim that was leased by the plaintiff to the defendants, that they were not a necessary part of the notice of location required under the applicable laws, and that it did not appear that the copies of the notices were certified by the proper officer.

Defendants, of course, rely upon the notices as proof of the fact that the boundaries of the leased claims at the time of the execution of the lease were not as contended by the plaintiff. They could serve no other purpose.

At this point it is well to note that ownership of the land upon which the 1937 mining operations were conducted by the defendants is not in issue in the present case. The sole question is whether or not the land as leased embraced the territory mined by the defendants in that year. The following instructions of the trial court upon the point indicate the theory upon which the trial was had:

"You are instructed that where placer mining claims are leased and the lessee goes into possession under said lease and does not surrender up such possession to the lessor, he, the lessee, is estopped to deny the title of his lessor to such leased premises.

"So, in this case, if you should believe that a preponderance of the evidence shows that the ground mined by the defendants in the mining season of 1937 was within the boundaries of the mining claims mentioned in plaintiff's Amended Complaint, as the boundaries of said claims existed at the time of the execution of said lease, to wit, July 31, 1936, then you should hence forth consider said ground as a part of the leased premises in your further consideration of this case."

This theory of the case, accepted by both parties at the trial, cannot be questioned for the first time on appeal. New York, L. E. & W. R. Co. v. Estill, 147 U.S. 591, 13 S.Ct. 444, 37 L.Ed. 292.

It is obvious, therefore, that even assuming arguendo that the notice purporting to claim the property known as "No. 1 above discovery" would tend to prove the boundaries of that claim, the evidence is immaterial to any issue in this cause. The boundaries of some adjoining claim could not possibly prove the boundaries of the property leased by the defendants, when it is remembered that the title to the leased property is not in issue.

■ We turn, therefore, to the notice purporting to claim property designated as "Yeager Bench claim", signed by Ney Yeager. There is no evidence in the case to tie this claim up with the claim in dispute. The only evidence in the record as to who located the Yeager Bench claim involved herein is the testimony of Mike Roka, a witness for the defendants, wherein he said, "*Henry* Yeager staked Yeager Bench". [Emphasis supplied.] No date is given for the staking of the claim. There is nothing in the testimony to indicate that Ney Yeager and Henry Yeager were the same person. For all that appears by the record the location by Ney Yeager may have lapsed for nonperformance of the annual labor required by the law of Alaska, and the claim by Henry Yeager may have been staked after the first claim's expiration.

■ But even assuming that the notice of location signed by Ney Yeager might have some evidentiary value in determining the boundaries of the claim with which we are here concerned, there is another reason why the trial court's ruling as to the admissibility of the location notices should be affirmed. The copies were certified by the United States Commissioner of the Mt. McKinley Precinct, Fourth Division, Territory of Alaska. The certificates state that the copies are full true and correct copies of the notices recorded in the Office of Records, McGrath, Alaska. The claims purported to be described are located in Innoko Precinct, Alaska.

We quote the following from the proceedings at the trial relative to these notices:

"The Court: I just wish counsel would look into and give me the benefit of their investigation as to how the Recorder, or Commissioner, for the Mt. McKinley Precinct has any records with reference to Ganes Creek. I had the idea that Ganes Creek was in the Innoko Precinct.

"Mr. Clegg [counsel for the defendants]: It was in the Second Division, as I understand it, at the time these notices were recorded.

"Mr. McGinn [counsel for the plaintiff]: These records are not in the possession of the Innoko Precinct?

"Mr. Clegg: No, they are in the possession of the Commissioner at McGrath.

"Mr. McGinn: But do they belong there?

"Mr. Clegg: I don't care where they belong. That is where they are now.

"The Court: I don't think the certificate by the wrong commissioner would be at all proper. I want an investigation. I want you to show he was the proper commissioner.

"Mr. Clegg: Counsel didn't raise that question at all.

"The Court: I know, but I have to look at that too. If it is not properly certified, it is immaterial and the objection sustained to it. That has to be taken into consideration.

"Mr. Clegg: If it can be shown that these original records, in the office where they might be supposed to be found at the present time, were not found there on account of a fire, would certainly authorize the introduction of these documents, irrespective of where they were recorded.

"The Court: I think you would have to prove the copies. It seems to me you would have to prove them."

No further proceedings were had in the matter until the motion of the plaintiff that the exhibits be stricken. One of the grounds of the motion was: "* * * on the ground * * * that this notice describes the property, as being situated on Ganes Creek, a tributary of the Innoko River, in the Nulato Mining District, Territory of Alaska, and a certificate is attached thereto by W. J. Widman, United States Commissioner for the Mt. McKinley Precinct, Fourth Division, Territory of Alaska, and it nowhere appears that he is the proper custodian, any certificate by him would have no force and effect. * * *" The court thereupon granted the motion to strike.

The record shows that the records of the Innoko Precinct were destroyed by fire in 1930, but it nowhere appears how they came into the possession of the Commissioner of the Mt. McKinley Precinct.

As stated by 22 C.J. 835, Sec. 975: "Where certified copies of public records are offered, it should appear that the officer by whom they are purported to be certified had the right to the custody of the records, and was the person who had authority to furnish authenticated copies."

Counsel for the defendants was given a full opportunity to present evidence on the question, and he refused to do so. In the circumstances we cannot say that the trial court erred in striking the exhibits from the record.

Defendants' last specification of error relates to the amount of the recovery. It is contended that no evidence was submitted upon which the jury could legally compute the amount due plaintiff under the terms of the lease, after finding that the premises mined during 1937 by defendants were covered by the lease. In plaintiff's complaint she alleged upon information and belief that the amount of gold taken from the disputed area exceeded $75,000. The jury rendered its verdict on this count for $9,375, exactly 12½% of $75,000. Defendants argue that the jury not having sufficient evidence before it on the question took note of the allegation of the complaint and computed the amount due on the assumption that the $75,000 was the amount mined. It is stated that the plaintiff had it within her power to secure the records of the mining operations from the defendants to ascertain the exact amount of gold extracted, and having failed to do so the judgment should be reversed.

We deem it sufficient to say in answer to this specification of error that the question of the sufficiency of the evidence in this regard was not raised in the trial court, nor is there any sufficient assignment of error raising the question. The assignment of error upon which the defendants base this specification reads: "The Court erred in giving and entering judgment in favor of the plaintiff and against the defendants that plaintiff have and recover of and from the defendants the sum of $9,675.00 with interest thereon from October 13, 1939, at six percent per annum, to which defendants duly excepted, and an exception was allowed". This is not a valid assignment of error. United States v. Shingle, 9 Cir., 1937, 91 F.2d 85, 90, and cases there cited.

We do not have before us all the evidence placed before the jury on the question of damages, and have merely the statement of the defendants in their trial brief: "The computations and figures presented by plaintiff's witnesses were so disconnected, involved and contradictory that they could only lead to confusion in the minds of the jury as well as anyone else reading the record." However, it is apparent from this statement that there were

some computations given, and that it was not left entirely to guesswork to ascertain how much gold was taken from the leased premises.

The defendant Speljack on the stand testified that he could tell from his bank statements the exact amount of gold taken out of the disputed area. With this in mind, the language of the court in Montana Mining Co. v. St. Louis Mining & Milling Co. of Montana, 9 Cir., 183 F. 51, 70, is apropos: "It is objected that the court admitted immaterial, irrelevant, and incompetent testimony, introduced on behalf of the St. Louis Company, for the purpose of establishing the value of ores taken from the vein in question by the Montana Company from under the Nine Hour claim. The ore sued for had been taken and carried away by the Montana Company. The St. Louis Company was therefore unable to prove the value of the specific ore taken, but it was allowed to show the value of similar ores taken from the same vein nearby. The evidence appears to have been the best the St. Louis Company could secure. If the value of the ore thus ascertained was incorrect and excessive, the presumption is that the Montana Company, having taken the ore and disposed of it, had the means to show its actual value."

▉▉▉ We come now to plaintiff's appeal. The court instructed the jury as follows: "If you believe that a preponderance of the evidence in the case shows that the plaintiff authorized the defendants to do assessment work upon said claims, agreeing to pay for the same * * * you should find that there is nothing due the plaintiff from the defendant from the mining operations of the defendants for the year 1936. If, however, the evidence as to any of the above-mentioned allegations is equally divided or preponderates in favor of the plaintiff, then you should find that the sum of $300.00 is due the plaintiff from the defendants from their mining operations during the year 1936, *together with interest thereon at the rate of six percent per annum from the 4th day of October, 1936,* and such sums should be added to the sum, if any, you find due plaintiff under instruction No. 2." [Emphasis supplied.]

Another instruction reads: "If, * * * you find that the ground mined by the defendants during the year 1937 was a part of said leased premises, you should ascertain, by a preponderance of the evidence, the value of the. gold dust, and so forth, mined and recovered from said leased premises by the defendants during the year 1937, and you should find in favor of the plaintiff for 12½% of said value, *together with interest thereon at the rate of six per cent per annum from the close of the mining season of 1937."* [Emphasis supplied.]

We have quoted the verdict of the jury earlier in this opinion. The finding is that there was due and owing from the defendants to the plaintiff "the sum of $9,375.00 plus $300.00 withheld * * *, together with interest thereon".

The court in rendering judgment upon the verdict allowed interest on the sum of $9,675 from the date of the judgment, October 13, 1939.

The point is made by plaintiff that interest should have been allowed on the $300 from October 3, 1936, and on the $9,375 from the close of the 1937 mining season.

The question of the sufficiency of the jury's verdict was not raised by the plaintiff until the trial court had discharged the jury. Counsel did not request that the jury make the verdict more definite. The judgment of the Court is in conformity with the verdict as rendered. If counsel for the plaintiff wished to question the verdict as conforming to the Court's instructions, he should have raised that question at the time of its rendition.

Plaintiff has cited us no cases, and our research fails to disclose any, authorizing the trial court or the appellate court to correct or add to a verdict after the jury is discharged.

Affirmed.