[Civ. No. 8757. First Appellate District, Division One.—February 17, 1933.]

SECURITY FIRST NATIONAL TRUST & SAVINGS BANK (a Corporation) et al., Appellants, v. WILLIAM LOFTUS et al., Respondents.

John H. Burke for Appellants.

Loeb, Walker and Loeb for Respondents.

COMSTOCK, J., *pro tem.*—This is an appeal by the plaintiffs from a judgment in favor of the defendants in an action for the recovery of money and for the reformation of an oil and gas lease and the recovery of certain royalties alleged to be due under the lease as reformed.

Under date of June 15, 1927, the parties to this action entered into the lease in question, whereby the plaintiffs leased unto the defendants certain lands at Signal Hill, Los Angeles County, for the purpose of exploring, mining and operating for oil and gas and other incidental purposes. The lease, among other things, contained the following clause: "That the Lessees will pay to the Lessors, in cash, the royalties hereinafter specified, and in the manner following: The Lessees shall, on or before the 20th day of each and every calendar month, account to the Lessors for all petroleum produced and saved from the well on the demised land during the preceding calendar month, and at such accounting shall pay to the Lessors the value of one-sixth (1/6) of the total amount of such petroleum so produced and saved; one-half (1/2) of one-sixth (1/6) of all such payments shall be made to the Western Savings Bank of Long Beach, California, for the account and to the credit of Frank G. Butler and Hannah N. Butler, and one-half (1/2) of the one-sixth (1/6) royalty of all such payments to be made to the Long Beach Branch of the Pacific Southwest Trust and Savings Bank, for the account and to the credit of Trust No. 3621, Central Office, File No. 1 Long Beach Branch, Butler Lease, for account and to the credit of the Lessors. The value per barrel of such petroleum shall be deemed to be the prevailing current price per barrel, publicly offered at the time of the production of such petroleum by the Standard Oil Company of California to producers generally in the oilfield or district within which said leased land is situated for petroleum of like gravity."

The theory of plaintiffs' action is twofold: First, that defendants are, under the lease as written, indebted to plaintiffs in the amount sued for as a royalty based upon the value of one-sixth of the total price of oil produced and sold from the leased premises during the period alleged; and, secondly, that the agreement of the parties was that defendants should pay plaintiffs a royalty equal to one-sixth of the total price received by them for the oil, but that through mutual mistake, or a mistake made by the plaintiffs and known or suspected by the defendants, said agreement was omitted from the lease and the clause fixing the price publicly offered by the Standard Oil Company of California, as above quoted, erroneously inserted therein as the

basis for computing the royalty, and that reformation should be granted and plaintiffs be given judgment for the full one-sixth of the price received by defendants for all oil sold.

It was stipulated (saving to plaintiffs all rights with respect to the construction of the lease) that one-sixth of the value of all petroleum produced and saved from the land, based upon the current prevailing price per barrel publicly offered at the time of production by the Standard Oil Company of California to producers generally in the district within which the land is situated for petroleum of like gravity, had been paid to plaintiffs, and that defendants had received for petroleum produced from the leased premises and sold by them certain sums in excess of said Standard Oil Company price, one-sixth of which excess amounted to $9,271.89, no part of which had been paid to plaintiffs.

The court found in favor of the defendants upon all issues. Appellants contend that the evidence does not support the findings and judgment and that the findings and judgment are contrary to the evidence. No particular finding is pointed out as being lacking in necessary evidentiary support, but it is argued that the evidence shows without conflict a right to reformation and that regardless of the theory of reformation the lease as written should receive a construction to the effect that plaintiffs are entitled to not less than one-sixth of the said Standard Oil Company price and one-sixth of the total sale price if sold for more. We cannot agree with these contentions.

It appears from the evidence that there were some preliminary negotiations between the plaintiff Frank G. Butler and the defendants, at the office of the defendant Loftus, in Los Angeles, shortly before the lease was executed, during which the amount of the royalty was bargained for. Butler asked one-fifth, having been offered that by others. Loftus offered one-sixth, which was acceptable to said plaintiff. There was no conversation relating to the Standard Oil price nor to any particular basis for the computation of royalties. Neither was there any conversation relating to many other details of the formal lease later prepared. At this time defendants were engaged in selling oil to the Standard Oil Company and no bonus or sum in excess of any standard or uniform price level was mentioned nor appeared to be in the minds of the parties. There had been a former lease

negotiated between Mr. Butler and another and the defendants during the preliminary discussion of which Mr. Butler had insisted on a clause similar to the one concerning the Standard Oil price. He had then stated that they did not want to be bothered with getting their money. They wanted the money and they wanted the Standard Oil price. They did not want it sold to some friend of the lessees for less. To whomever they leased they wanted to be paid the money; they did not wish to be bothered with the oil. Defendants prepared the lease in question here and in its formal arrangement included the clause concerning the Standard Oil price, believing that since this had been insisted upon in discussing the lease formerly bargained for it would be desired in this one. Loftus stated that by inserting this provision he understood the intent and meaning to be that no matter what price the lessees got for their oil, they were under the obligation to pay the lessors based upon the Standard Oil price and exactly that. A portion of his testimony may be directly quoted: "Q. Will you tell the court exactly what you understood to be the meaning and intent of that provision when you put it in the lease? A. My understanding was that we would pay them the Standard market price, and I would like to qualify that by saying that Mr. Graham objected to that, saying we might get stuck; maybe we can't sell the oil and we will have to sell it for less, but it was agreed on anyway. It was after the lease was drawn that that discussion was had. Mr. Burke [counsel for appellants]: I move to strike out everything that was said by Mr. Graham and Mr. Loftus not in the presence of plaintiff. Q. By Mr. Walker [counsel for respondents]: Was this said in the presence of Mr. Butler? A. No. Mr. Walker: I consent that it be stricken out. A. My intention was that he would get that money, and no matter what we got we were under that same obligation, by agreeing to pay it, whether we got the Standard price or not. I have a lease of that kind now. The Court: Was there any question of bonus discussed during any of the negotiations? A. No, no. At that time there was no bonus being paid. Q. That already appears. Did anybody mention bonus, did anybody say 'Well, if you get a bonus'—did anybody say 'We will so draw the lease that if you get a bonus you will get that in addition to the Standard price'? A. No, there

was nothing of the kind said at all. Q. By Mr. Walker: Nothing relating to any such matter as that? A. No. Q. In inserting that provision in the lease did you intend by that to mean that if you received a bonus that a portion of the bonus would be paid to the plaintiff in this action? A. No. Q. Or the lessors in that lease? A. No, we didn't." Mr. Loftus mailed the lease to Mr. Graham, who, before signing, read it thoroughly, as it was his duty to do.

From the foregoing it is plain that there was not only direct evidence that defendants were not mistaken in any respect as to their contract, and did not know or suspect that plaintiffs, or any of them, were mistaken, but there were abundant facts and circumstances from which the trial court might have inferred that even plaintiffs were not mistaken. Reformation in case of mistake may be granted only where the case is brought within the provisions of section 3399 of the Civil Code. The language used by the Supreme Court of this state in *Burt* v. *Los Angeles Olive Growers' Assn.*, 175 Cal. 668 [166 Pac. 993, 996], seems particularly applicable to the situation before us. The court there said: "Every presumption in equity favors the view that such a contract as this, thus deliberately entered into, expresses the true intent and meaning of the parties. The burden of showing the contrary is upon the party seeking to avoid its plain terms. Under this evidence it cannot be successfully contended that the mistake was mutual or that it was induced by plaintiff by the suppression of any term in the contract, or even that it was known to plaintiff, or suspected by plaintiff, that defendant did not understand its terms. . . . This testimony is aided by the legal duty imposed upon a party to read such a contract before executing it. [Cases.] . . . And finally upon this subject it should be said that while it is quite true, as declared in *Los Angeles & Redondo R. R. Co.* v. *New Liverpool Salt Co.*, 150 Cal. 21 [87 Pac. 1029], that the mere failure of a party to read an instrument with sufficient attention to perceive an error or defect in its contents will not prevent its reformation, this means no more than that when the cause of this failure is satisfactorily explained to the court of equity, that court will hold that the explanation or excuse of the failure relieves from the charge of the neglect of a legal duty within the meaning of section 1577 of the Civil Code. The trial

court in this instance manifestly took the view either that the failure to read the contract comprehendingly was not sufficiently explained and excused or that in fact the contract was read comprehendingly and the defendant was but attempting to escape the consequences. . . . It is immaterial which of these two views the trial court in fact adopted. Either is sustainable under the evidence.'' (See, also, *Meyerstein* v. *Burke,* 193 Cal. 105 [222 Pac. 810] ; *Ward* v. *Yorba,* 123 Cal. 447 [56 Pac. 58] ; *Kepner* v. *John M. C. Marble Co.,* 26 Cal. App. 696 [148 Pac. 231].)

Appellants quote freely in their brief from the testimony of Mr. Graham and from that of Mr. Loftus given both upon direct and cross examination and argue therefrom that a reversal of the judgment of the trial court must follow. We deem it unnecessary to enter into a detailed discussion of this testimony as it does no more than raise a conflict with which we will not concern ourselves upon this appeal, the evidence as a whole being sufficient to sustain the findings and judgment of the court below.

There is no word of evidence in the record tending to prove that the plaintiffs Security First National Trust and Savings Bank and Hanna N. Butler were parties to the alleged mistake, but we need not notice whether there was a relationship of principal and agent between them and Frank G. Butler, nor whether their interest in the contract was such as would entitle them to claim a reformation of the instrument, in view of our conclusion that there was no such mistake, mutual or otherwise, as would justify a reformation as to any plaintiff.

Certain clauses of the lease relating to payment by the lessees to the lessors of one-sixth of the net proceeds from the sale of gas or gas products are stressed by appellants, as well as a clause providing for the payment of taxes assessed due to the discovery of oil or gas in the proportion of one-sixth by the lessors and five-sixths by the lessees. It is argued that these throw light upon the intention of the parties to contract for the payment of a one-sixth royalty on the total amount of petroleum sold, without regard to the Standard Oil price. Further, appellants urge that the word ''deem'' as used in the clause providing for the Standard Oil price basis as to the petroleum is used in the sense of ''consider'' or ''suppose''. It is, however, conceded that

it has also been held to mean "adjudge", "hold", and "to determine upon consideration". Upon this premise, appellants insist that even without reformation the clause taken in conjunction with defendant Loftus' testimony that Graham did not want them to sell the oil to some friend for less than the Standard Oil price means that if they secured a greater price one-sixth thereof would be paid to plaintiffs. It is somewhat difficult to follow this argument and it appears to us illogical. The plain sense in which the word "deem" is employed in the clause under consideration is that the Standard Oil Company's prevailing price per barrel publicly offered in the oil-field or district concerned shall be adjudged or held to be the fixed basis of value for the computation of the royalty on the oil. Defendant Loftus' testimony that in negotiating for the former lease Mr. Butler insisted upon a similar clause because he did not want the lessees to sell to some friend for less than the Standard price is of no aid whatsoever to appellants in this con- nection, for it is not necessarily in conflict with his other testimony to the effect that they intended the clause to mean that exactly the Standard Oil price should govern. But it must be remembered that the evidence of preliminary oral negotiations bore only upon the issue of reformation. There is no ambiguity or uncertainty in the language employed; hence there is no need to resort to extrinsic evidence to determine its meaning. The language is clear and explicit and the intention of the parties may be easily ascertained from the writing itself. Had the parties meant that the lessees were to pay the royalty based upon not less than the Standard Oil price and in any event upon the actual price received for the oil if sold at a greater price than that, nothing would have been simpler than to have incorporated said intention into the writing in plain and definite language. Not having done so, and the language which they did employ being plain, they are bound by it. We are not privileged to make a different contract for them. (6 Cal. Jur. 277; Civ. Code, secs. 1638, 1639.)

We find nothing in those clauses relating to a straight one-sixth royalty upon the sale price of the gas and gas products which militates against the clear meaning of the provisions concerning the oil. Conditions may have been such in connection with the marketing of these items that but one price

basis was reasonably possible. Then, again, the quantity of these items expected to be developed for sale may have been of very little importance compared to the oil. As to the taxes, the parties were free to fix any basis they wished for the division of this expense, and since at the time of making the contract the lessees were selling oil produced by them from other properties to the Standard Oil Company, and were receiving no bonuses, it appears that the proportions agreed upon for payment of taxes were the most natural and equitable under the circumstances, and in no measure inconsistent with the intent and meaning of the petroleum provision as we have read and construed it.

It follows that the judgment should be affirmed. It is so ordered.

Tyler, P. J., and Knight, J., concurred.