CONTINENTAL OIL CO. et al. v. UNITED STATES.

UNITED STATES v. CONTINENTAL OIL CO. et al.

No. 11774.

United States Court of Appeals Ninth Circuit.

Oct. 16, 1950.

L. R. Martineau, Jr., Richard C. Heaton, Joseph P. Rinnert, Glenn B. Martineau, all of Los Angeles, Cal., for appellant Continental Oil Co.

D. W. Woods, Martin J. Weil, Olive E. Boswell, all of Los Angeles, Cal. (A. L. Weil, Los Angeles, Cal., of counsel), for appellant General Petroleum Corp.

A. DeVitt Vanech, Asst. Atty. Gen., Robt. E. Mulroney, Attorney, Dept. of Justice, Washington, D. C., Francis B. Critchlow, Sp. Asst. to Atty. Gen., Marvin J. Sonosky, Attorney, Dept. of Justice, Washington, D. C., for United States of America.

Before HEALY and POPE, Circuit Judges, and LING, District Judge.

POPE, Circuit Judge.

In 1929 and 1930 the United States issued to appellants Continental Oil Company and General Petroleum Corporation, herein called, respectively, Continental and General, various oil and gas leases, covering lands in the Kettleman Hills field in California. The leases were made pursuant to section 14 of the Mineral Leasing Act of February 25, 1920, 41 Stat. 442, 30 U.S.C.A. § 223.

The Secretary of the Interior, asserting that the posted prices for crude oil in the field, and the prices at which these companies sold and disposed of natural dry gas and natural-gas gasoline,[1] and upon which they calculated and paid royalty under the leases, were unreasonably low, and not in accord with true values, in 1931 made certain orders establishing minimum limitations upon valuations of oil and gas for royalty purposes. The companies affected by the orders declined to conform to them or to pay in accordance therewith, and this suit was instituted against Continental, General, and 14 other lessees, to secure a judicial determination of the Secretary's authority to make the minimum limitation orders, to recover additional royalties asserted to be due under such orders, and to obtain cancellation of leases of defendants who failed to comply with the court's orders in respect to such matters.

Concerning the Government's claim for additional royalty on account of crude oil, the trial court held that under the terms of the leases the Secretary of the Interior was not empowered to make a binding determination of the value of the crude oil and that the companies were not obligated to calculate or pay royalty on the minimum price basis prescribed by the Secretary's order. The court held, however, that during the period July 1, 1929 to August 29,

---

1. Natural-gas gasoline, extracted from gas, is also known and referred to in the record as "casing-head gasoline".

1935, the crude oil market at Kettleman Hills was not an open market and that the posted prices for crude oil there during that period did not reflect the market value thereof. The court found that the lessees were required by the leases to pay a royalty based upon market value of the oil produced, which value the court found to be in excess of the posted prices on which the Companies had made settlement, and required them to account and pay for the difference. The unpaid balance determined by the trial court to be owing by Continental on account of crude oil royalties was $128,261.50; the balance charged to General was $162,395.98, exclusive of interest. With respect to the Secretary's orders determining minimum valuations of dry gas and casing-head gasoline for royalty purposes, the court held that the Secretary's orders if enforced prospectively, that is to say, with respect to the production subsequent to the dates of the orders, were expressly authorized by the leases and were valid and enforcible, and that the Companies must account for additional royalties in accordance with those orders.

Continental and General have appealed from the judgment entered upon such findings and the United States has cross-appealed contending: (1) that the court erred in holding that the Secretary lacked power to determine the value of crude oil for royalty purposes; (2) that the court erred in its determination of the market value of the crude oil at Kettleman Hills in that the value found by the court was too low; and (3) that the court erred in holding that the Secretary's minimum value order relating to natural gas dated June 7, 1937, and referred to as the "natural gas net realization order", was invalid as applied to gas produced prior to June 1, 1937. Both sides assign error in respect to the court's computation of interest upon the recoveries.

The facts of the case are very clearly stated in the able opinion of the district court which is reported in 73 F.Supp. 225.

For this reason we consider it unnecessary to state the facts that give rise to the controversy here present except to the extent required to bring in mind the essential facts upon which, in our opinion, the decision must turn. And because that opinion so thoroughly discusses the issues presented in the court below, we propose here to make frequent reference to portions thereof.

The rights of the parties are determined by the provisions of the leases, read in the light of the provisions of the Mineral Leasing Act, and we shall therefore briefly allude thereto.

General is an integrated company, that is to say, one which is engaged in all branches of the petroleum industry from the production of crude oil to marketing, both wholesale and retail, of refined petroleum products; while Continental on the other hand, is so far as production in California is concerned, a non-integrated defendant, engaged solely or primarily in the production of crude oil and natural gas. We shall note that this difference in the operations of the two appellants gives rise to different problems with respect to each of them.

1. Provisions of Leases Relating to Royalties.

The leases provided for royalty at varying percentages of production depending upon whether the leases were so-called "(a)" leases issued in consequence of the lessee having become entitled thereto as a permittee under a prospecting permit under sections 13 and 14 of the Mineral Leasing Act, 41 Stat. 441, 442, cf. Title 30 U.S.C.A. § 223, or whether they were the so-called "(b)" leases calling for a higher royalty rate or percentage. The percentage under the "(a)" leases was 5%; the percentage under the "(b)" leases, ranged from 12½% to 33⅓%. But, aside from this variation in percentage, the language of the leases with respect to the payment of royalty, was the same.[2] Under

2. In 1931 all of the lessees, with the approval of the Government given pursuant to the Act of July 3, 1930, 46 Stat. 1007, 30 U.S.C.A. §§ 184, 226, organized

the Kettleman North Dome Association, (referred to in the testimony as "Kenda"), to operate the Government leases on Kettleman North Dome as a unit, and

section 2(c) the lessee under the (a) lease was required "To pay the lessor in advance, beginning with the date of the execution of this lease, a rental of one dollar per acre per annum during the continuance hereof, the rental so paid for any one year to be credited on the royalty for that year, together with a royalty on all oil and gas produced from the land leased herein (except oil or gas used for production purposes on said land or unavoidably lost), as follows: Five per centum (5%)."

The corresponding section of the (b) lease was identical except that instead of the five per centum mentioned in the (a) lease, a scale of varying percentages depending upon the character and quantity of the production was specified. In § 2(c) (3) appearing in all leases, the royalty on the gas and casing-head gasoline was fixed at a designated percentage of its value, and provided: "The value thereof in the field where produced, of gas and casing-head gasoline, for royalty purposes, unless such gas or casing-head gasoline is disposed of under an approved sales contract or other method as provided in subdivision (d) of this section, *shall be as fixed by the Secretary of the Interior*". (Italics added).

The leases further provided that "When paid in value, such royalties shall be due and payable monthly on the 15th of each calendar month following the calendar month in which produced, to the Receiver of Public Moneys of the land district in which the land is situated; when paid in kind, such royalty oil shall be delivered in tanks provided by the lessee on the premises where produced, unless otherwise agreed to by the parties hereto, at such times as may be required by the lessor * * *."

Under § 2(d) of the lease, an additional obligation of the lessee was stated as follows: "(d) Sales contracts.—To file with the Secretary of the Interior copies of all sales contracts for the disposition of oil and gas produced hereunder except for production purposes on the land leased, and in the event the United States shall elect to take its royalties in money instead of in oil or gas, not to sell or otherwise dispose of the products of the land leased except in accordance with a sales contract or other method first approved by the Secretary of the Interior".

It is noted that although the percentages are listed with great detail, as, for instance, the requirement that the royalty shall be "Five percentum (5%)" or "12½ per cent", as the case may be, yet § 2(c) quoted above omits to state whether royalty is calculated at 5% or 12½% of the *value of the production* or of the price *at which the production is sold,* in cases where royalty is taken in money instead of in kind. It should be observed, however, that the Mineral Leasing Act, whose terms and provisions are made a part of the lease, in providing for royalties of varying percentages, recites that the royalty shall be a certain percent "in amount or value of the production". Act of February 25, 1920, c. 85, sec. 14, 41 Stat. 442. It is also to be noted that the language in italics in the above quotation from section 2(c) (3) authorizes the Secretary of the Interior in certain cases to fix the values of gas and casing-head gasoline for royalty purposes, but there is no similar provision authorizing the Secretary to fix the values of crude oil.

### 2. The Secretary's Minimum Value Order Respecting Crude Oil Royalties.

About April 18, 1931, the Secretary of the Interior had arrived at the conclusion that the posted prices for crude oil at Kettleman Hills were less than the market value of the oil. The Secretary notified all Government lessees in the field that the United States proposed to take in kind all royalty oil and wet gas and advertised for bids for such oil and gas. He received no satisfactory bids. Then on June 4, 1931 he

---

divide the production among the members in proportion to their acreage holdings. Thereafter each lessee paid royalties on its share of the oil and gas produced by the association from the whole area without regard to the production from the lessee's own lease. It is conceded that the creation and operation of this association did not alter or modify the rights or obligations of the parties under the leases.

issued an order which notified the lessees that offers for purchase of the Government's royalty oil and wet gas at private sale at not less than the market price would be received until noon on June 22, 1931, and that in the absence of satisfactory offers before that time, all royalty accruing to the United States from lands in the oil and gas field would be taken in money computed in accordance with the terms of the leases. The order then stated: "Your attention is called to the lease requirement (§ 2-d) that when the United States shall elect to take its royalties in money instead of in oil or gas, the lessee shall not sell or otherwise dispose of the products of the land leased except under a sales contract or other method first approved by the Secretary of the Interior, and to the fact that approval heretofore accorded existing sales contracts has been given subject to the condition that nothing therein contained shall be construed as affecting any of the relations between the United States and its lessee, particularly in the matter of taking royalty in kind and the method of computing royalties due as based on a minimum price; to the lease provision (§ 2-c-3) that the value in the field where produced, of gas and casing-head gasoline for royalty purposes shall be as fixed by the Secretary of the Interior, and to the fact that the minimum price basis for royalty settlements on gas in California has heretofore been fixed at 5 cents per 1,000 cubic feet and on natural gas gasoline in Kettleman Hills at 6 cents below the current published San Francisco price for gasoline in tank wagon lots, exclusive of tax, such prices to be used in computing royalty accruing to the Government unless the lessee receives a greater price, in which case such greater price shall be used. *Supplementing these provisions, effective July 1, 1931, and until further notice, the highest price posted in California for crude oil of equal or lower gravity is fixed as the minimum price basis on which settlements shall be made for royalty on crude oil produced in the North Dome Kettleman Hills field, a higher price to be made the basis of settlement if and when obtainable.*" (Emphasis supplied.)

The portion of the quoted order which is italicized constitutes the so-called minimum value order relating to crude oil, the terms of which the Government sought to enforce in this action.

The district court held that the Secretary was without power under the leases to make such an order for the reason that while the leases reserved to the Secretary the right, in certain cases, to fix the royalty value of natural gas, the leases contained no reservation of a similar right in respect to royalty value of crude oil.

The Government contends that section 2(d) of the leases quoted above, which empowered the Secretary to approve or disapprove sales contracts for the disposition of oil produced under the lease, whenever the United States should elect to take its royalties in money, impliedly grants the Secretary the power to make such an order. The power to approve or disapprove the sales contract or other method of disposition of production under the leases, the Government says, embraces the lesser power to approve on condition. The effect of the Secretary's order, it is said, was to approve the proposed method of disposal "on condition that the royalties be paid on the basis of the minimum value fixed by the Secretary". The Government argues that the district court's conclusion that this section did not so empower the Secretary was based on a stringent application of the principle of *expressio unius est exclusio alterius*. The Government points out that the original lease forms established by regulations contained section 2(d) but not section 2(c) (3); that the latter section was inserted later to protect the royalty interests of the United States in respect to gas production which was being disposed of by waste and other non-commercial methods. The Government argues that since the section 2(c) (3) was inserted for this special purpose, its inclusion in the lease should not form the basis for any decision that its express language demonstrates an intentional exclusion of the right to fix the value of royalty oil.

We think that the conclusion reached by the trial judge was right. We believe that such a conclusion must be arrived at in the premises not merely by application of the rule *expressio unius est exclusio alterius* but for the simple reason that no such right to determine the value of royalty oil is stated in the lease. Leases of the kind here involved are predicated upon large expenditures of money, time and effort in making the required discoveries and in bringing these properties into production. The rights of the lessees are valuable property rights. A contract provision authorizing one party to a contract to fix the obligation of the other party by unilateral action, is so foreign to ordinary contracts and so drastic in its operation that we think it should not be implied in the manner for which the Government is here contending. We think that such a right cannot have been within the contemplation of the parties in the absence of an express reservation to that effect.

3. Whether the Posted Prices for Crude Oil at Kettleman Hills Represented the True Values Thereof for Royalty Purposes.

After determining that the Secretary of the Interior was without authority to fix the value of the royalty oil, the court proceeded to determine what was the reasonable value of the oil for the period in question. It found that the integrated defendants, including General, made it a practice to post or publish for the field, a schedule of the prices which they were currently paying or offering to crude oil producers. It found further that at no time prior to August 29, 1935, was there an open or competitive market for crude oil at Kettleman Hills and that at such times the posted field prices were artificial, discriminatory, and substantially less than the prices the integrated defendants were paying for comparable crude oil in other California fields and substantially less than the reasonable market value of the oil.

The court further found, however, that after the date mentioned, the posted prices did represent the reasonable market value of the oil.

The finding that the posted field prices were substantially less than the reasonable market value of the oil, is attacked by the appellants on a number of grounds. Thus, Continental, as a nonintegrated company, which the court held had nothing to do with the determination of the posted prices, asserts that such a finding, whether supported by evidence or not, is immaterial with respect to it. With that contention we shall deal later. The argument which we must now consider is that the evidence is insufficient to support or justify such finding. This argument proceeds in two forms. 1. In the first place it is contended that a major portion of the evidence upon which this finding is based was irrelevant, incompetent and inadmissible. 2. It is further asserted that even assuming the relevancy and competency of such evidence, a fair consideration of all the evidence would demonstrate that the finding was clearly erroneous.

The evidence upon which the trial court based its finding upon this point, and its analysis of the facts disclosed by the evidence, and the method by which it arrived at its determination, are set forth in those portions of the court's opinion which appear at pages 238 to 249 of 73 F.Supp. It is there disclosed that in arriving at this finding the trial court relied in part, although not entirely, upon certain computations compiled by one McCammon, and introduced as part of McCammon's deposition.

The evidence discloses that the posted field prices were made by Standard Oil Co., an integrated defendant, and that while General and the other integrated defendants also posted prices, they generally adopted those prepared and posted by Standard. In an effort to establish the manner in which Standard arrived at its posted prices, and the factors taken into consideration by it in doing so, counsel for the Government requested Standard to furnish the name of one of its employees who could testify concerning Standard's computations of posted prices. McCammon was designated by Standard for that purpose. In his deposition he identified a series of schedules, samples of which appear as tables B and D

on pages 241 and 242 of the court's opinion, 73 F.Supp. These schedules, received as exhibits and from which much of the information contained in the district court's opinion is derived, disclose the witness' analysis of the data from which Standard's posted prices in various fields in California were said to have been derived.

It is strongly urged by appellants that the witness was not competent to furnish this information; that the schedules were put together by McCammon in 1939, after the inception of the suit, and from miscellaneous data procured from Standard's files. It is further urged that McCammon had no personal knowledge of the factors which went into the making of the posted prices established by Standard Oil Co.; that the figures and computations were secured by him from a search through Standard's files and by word of mouth from other employees of Standard, and other similar sources, that they are based on hearsay only,[3] and that therefore the schedules should have been excluded. Appellants assert that they cannot be considered as a basis for the court's finding as to inadequacy of the posted field prices.

It is to be noted that the district court, 73 F.Supp. at page 245 of its opinion, supra, calls attention to other evidence which it considered tended to establish the same conclusions as those indicated by the McCammon computation. In its briefs before us, the Government urges that the schedules of prices of the major price posting com-

3. The following extracts are taken from McCammon's testimony: "You understand, when I was trying to reconstruct these I was doing it with extremely fragmentary pieces of information. Apparently in this case none of the Valley prices were checked by the use of this Southern price, but, as I remember, I obtained that .2 cent figure from Mr. Allen who obtained it from his memory." "You did undertake, did you not, Mr. McCammon, to get the very best information that was available? A. That is correct.

"Q. Such sources of information as were here available to you were used, Mr. McCammon, the company's records and the company's personnel were available to you as sources of information? A. Yes, sir.

"Q. You got the best information that you could from the company's records and the company's personnel? A. That is correct, and from my knowledge, and everything I could piece together, that is, I tried to reconstruct what may have been computed prior to these first schedules in the best way that I could.

"Q. The information which caused you to use 437 End Point Stock in making your computations instead of the 400 End Point Stock which was used subsequently, what was that information? A. I don't recall that, either, off-hand.

"Q. You must have obtained that from some source. A. I think so.

"Q. Do you know whether it was from a record, or from information furnished you by somebody else? A. I think it was from a record.

"Q. Where did you get your information relative to the deduction figure which you used? A. From Mr. Allen.

"Q. From Mr. Allen? A. That is correct. As I remember it, he had it right in his mind. Let me see, now. He had a figure for manufacturing 27 gravity Signal Hill which, as I recall it he said was 8.4, and then he had a formula which was—he remembered this: That he had—in fact, that 8.4 was made up of a certain fixed sum per barrel of crude, and the balance was variable for the quantity of 410 End Point Gasoline Stock in the crude, so that in determining the manufacturing deduction for each crude, why, we used that flat deduction per barrel, plus this variable, times the percentage of 410 End Point Stock that is shown on the first or third column there.

"Q. Was that formula contained in any record or memorandum? A. No. As a matter of fact, we went back into Mr. Allen's memory, and knowing what he knew the answer to be, why we attempted to recall the method of breaking down the 8.4 between the fixed portion per barrel of crude and the variable portion, and as a result of that we came up with these particular figures.

"Q. Mr. McCammon, I call your attention to the sheet containing tabulations which has been marked 2-A for Identification. I ask you to tell us the source of that paper. A. Well, it came from a file which is contained, I am not too sure where it did come from. I thought it had come from—I am sorry. Well, I don't know, I am not sure at the moment that I do know where it came from. I thought, in looking at it, it came from the Secretary's office, but it doesn't have a tag on it. I am not sure whether it came from there or some other file; I couldn't tell you."

812

panies in all California fields, from the beginning of production at Kettleman Hills to the date suit was filed, and which are in evidence apart from the McCammon deposition are sufficient to show the existence of a discriminatory market at Kettleman Hills and that the posted prices there prior to August 29, 1935, were below the reasonable or true values of the oil. It is said that the price schedule evidence, with nothing more, supports the trial court's finding.

■ Because of the importance which the court attached to the McCammon schedule, we find ourselves unable to determine from the record whether the court would have made the same finding had the McCammon evidence been held inadmissible. Cf. Bridges v. Wixon, 326 U.S. 135, 154, 156, 65 S.Ct. 1443, 89 L.Ed. 2103. We therefore consider it necessary to determine whether the so-called McCammon schedules were properly before the court.

As disclosed by the trial court's opinion, 73 F.Supp at page 246, the compilations and computations were transmitted to counsel for the Government by Standard's attorney under date of September 29, 1941, prior to the taking of the deposition, and were accompanied by a letter, the so-called Felix letter, containing the statement: "The computations reflected in the enclosed were made by employees of the company and submitted to said executives in advance of the determination of such prices." The footnote, 73 F.Supp. on page 247 of the trial court's opinion sets forth the circumstances under which this letter was received and read in evidence.

It is plain that the court considered that it might credit the statement here quoted from this letter, because the letter had been received in evidence without objection. As to whether it was so received, the parties are in violent disagreement. The letter was read into the record in the course of a colloquy between counsel during an interruption in the reading of the McCammon deposition. Shortly before this interruption and during the reading of the deposition, after the question "Is any attempt made to arrive at the cost of different products?" objections were made which

pursuant to stipulation were on behalf of all parties, as follows: "I object to this question and to subsequent questions on the ground that they are incompetent, irrelevant and immaterial, and do not, nor does any one of them, tend to prove or disprove any issue presented by the pleadings * * *. That the offered testimony is irrelevant and immaterial on the issue of market value of Kettleman crude oil. The reasons or considerations or methods which prompted Standard to post a price for Kettleman crude have no relevancy in determining whether said posted price was or was not market value * * *. I make the further objection that the offered testimony is *res inter alios acta* and hearsay and offered without proper foundation * * *. Neither company * * * is shown to have acquiesced in or had any knowledge or notice of any of these matters or circumstances which may have been considered by Standard Oil Company of California in posting its prices. Under such circumstances, an admission made by an employee of Standard Oil Company of California cannot be evidence as to any other defendant." It was stipulated that the objections should run "to each question from now on in the deposition of Mr. McCammon."

In overruling the objections, the court expressed its view of the purpose of the evidence as follows: "Herein is offered evidence of the acts of certain integrated defendants as admissible against all defendants on the basis that such evidence is to lay a foundation for the introduction of certain other evidence; that is to say, that such evidence is expected to be connected with proof of other facts, all of which will show, on the part of the integrated defendants, a control of the market in Kettleman Hills. Upon such showing, plaintiff will then offer evidence other than that of market prices in such field, in order to establish value." The Court then stated: "May the acts of the integrated defendants be received in evidence against the non-integrated defendants as a foundation for the expected proof of value? Yes, upon plaintiff's theory of the case. Plaintiff contends and expects to show that the non-integrated defendants while not actually participating

in the establishment of market prices in Kettelman Hills, were aware of the existence of such prices; that they knew such were established by the integrated defendants; that such non-integrated defendants, for their own advantage, refused to account on the basis of true value, but accounted on the so-called market prices (posted prices) which were a false value. In such circumstances, it seems clear that evidence of such acts is admissible." Thereupon plaintiff proceeded with the reading of the deposition as shown in the footnote above mentioned, court's opinion, 73 F.Supp. at page 247, to the point which is the end of the first paragraph in the second column of the footnote. What follows in that footnote was the colloquy of counsel above referred to. The footnote would be more accurate if the matter to the conclusion of the first paragraph in the second column were in double quotation marks to indicate that to this point the deposition was being read and that at that point the reading of the deposition was interrupted.

Subsequently the court announced its interim opinion to the effect that the posted prices at Kettleman Hills were not representative of true value and announced that the court would then proceed to take further evidence as to the value of the oil and gas. Thereupon the Government proceeded to re-offer the McCammon exhibits as evidence of actual value. At that later stage counsel referred to the Felix letter and then interposed an objection that it was not admissible as to any of the defendants other than Standard.

The trial court placed much emphasis upon the quoted language from this letter. If the statement there made can be taken to be a fact, its importance is manifest. The Government was here undertaking to prove that the prices which Standard posted, and which the other integrated companies followed and adopted, were set arbitrarily low and with a purposeful disregard of true values; that is to say, in an effort to rig the market. The statement in the letter is that Standard's executives had

these computations before them when they established the prices. As the trial court pointed out, these particular sheets could not have been furnishd the executives, because these exhibits were prepared by McCammon after the case was filed. The court understood the letter to state that the same computations contained in the sheets had been supplied to the executives. If they were, then an examination of them, as is possible by an inspection of those summarized in the trial court's tables A, B, C, D, and E, 73 F.Supp. at pp. 240-243, would indicate a deliberate disregard of those factors which determined the prices in other fields, when Standard's executives came to fix the prices at Kettleman Hills.

That the statement in the letter was hearsay is plain. It was a testimonial declaration made out of court, and was considered by the court as in the record for the purpose of proving the truth of the fact there asserted. But the court held that it might consider the statement because the letter went in without objection.[4]

If the statement was received without objection, it was entitled to consideration as substantive evidence of the fact asserted, notwithstanding its hearsay character. Rowland v. Boyle, 244 U.S. 106, 108, 37 S.Ct. 577, 61 L.Ed. 1022; Reidy v. Myntti, 9 cir., 116 F.2d 725; Nelson v. Fernando Nelson & Sons, 5 Cal.2d 511, 55 P.2d 859. Had Felix, the writer of the letter, one of Standard's attorneys, been on the stand, his testimonial qualifications might have been drawn in question by a requirement that his knowledge of the matter be established. But again, if no proper objection was made, the statement has some evidential quality. Cf. Wightman v. Campbell, 217 N.Y. 479, 112 N.E. 184.

We think the court was right in its understanding that the letter was in evidence without objection, (the stipulation was that the objections stated should run "to each question from now on in the deposition",—the letter was not read in answer to any question), and we think the court had a right to assume that the de-

---

4. "No reservation or objection militates against the effect of the emphasized sentence in the above-mentioned letter". 73 F.Supp. 247.

fendants wanted the letter in the record. The letter contained certain reservations made by Standard, e. g., that "it does not represent or concede that such information, in fact, sets out formulae or bases on which its field prices were determined." This explains, we think, why the attorney for Standard, with the apparent acquiescence of all defendants, insisted on reading the letter into the record.

At the time the defendants had been put on notice, by the court's ruling, as to the theory upon which the court was proceeding, and that the evidence offered was being received against all defendants. If the appellants intended to object to the letter, they failed to manifest their intent to the trial judge. He was made aware of no such objection. It is elementary that objections to offered evidence must be sufficiently specific to bring their point home to the trial judge. Cook-O'Brien Const. Co. v. Crawford, 9 cir., 26 F.2d 574.

We cannot overlook the fact that, tenuous as this foundation is for the introduction of this evidence, that which was offered by the appellants upon this issue was not above suspicion. The government, after an effort to obtain, through discovery procedures, copies of the formulae on which the posted prices had been based, succeeded only in securing from General, and the remaining integrated defendants other than Standard, the information that they had followed the prices posted by Standard. In response to an inquiry as to who, in Standard's organization, could furnish the required computations, the Government was advised that McCammon was the man. McCammon's deposition left much to be desired in foundation, definiteness, certainty, and testimonial qualification, but it was obviously the best that the Government could produce. If the data there supplied was in any respect in error, it was assuredly within the power of the various defendants, and of any of them to supply comparable calculations and computations disclosing the factors bearing on values at the several fields. We agree with the trial court's statement that "these defendants possessed, or could obtain, all data through their own research which were in the possession of Standard." But neither Standard, nor any of the others, chose to produce more accurate computations than those of McCammon. Instead, they undertook to bottom their defense upon such general testimony as that Kettleman Hills oil carried much wax; that its gasoline was not high in octane rating; that the great new production in this field created an oversupply in the market, and a supply of oil of a type the industry was not prepared to handle; that this oil was subject to more than ordinary transportation losses; and the like. All such evidence was important, and we do not for a moment suggest that the court below might not have accepted it as fully explaining the posted prices notwithstanding much of it was controverted by other evidence. This, of course, was a fact determination which was entrusted to the trial court. But so far as the McCammon exhibits are concerned, their inaccuracy as to the matters shown therein, could be demonstrated only by evidence directed to proving wherein these schedules were in error.

We are mindful of the ancient rule, codified in the California codes, "That evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore, * * * if weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust." Cal.Code Civ.Proc. § 2061.

There was substantal evidence other than that furnished by the McCammon schedules tending to support the court's conclusion that because of a discriminatory market at Kettleman Hills, the posted prices for oil during the 50 months period prior to August 29, 1935, did not represent true values. Very complete schedules of posted prices established by the major price posting companies in California covering the various California fields were introduced in evidence, and reproduced graphically. Similar graphs permitted comparison of the treatment of Kettleman Hills oil during the

50 months period found by the court with that in the period subsequent thereto, which the court stated was a period when the posted prices reflected true values. The graphic study of these price schedules discloses that during the 50 months period prices posted in fields other than Kettleman show a correlation between price and gravity, with prices increasing with gravity. The same is true of the Kettleman prices after August 29, 1935; but for the 50 months period prior to that date, Kettleman prices are the same per barrel regardless of increases in gravity.

There was also evidence tending to show substantial identity between Kettleman Hills oil and Santa Fe Springs oil within the same gravity ranges. Comparison of posted prices during the 50 months period with respect to some gravities in Santa Fe Springs and in Kettleman Hills discloses a discrimination against Kettleman Hills very substantially in excess of anything to be accounted for by differences in transportation costs. On the other hand, when a similar comparison is made, in the period after August 29, 1935, the prices posted in the two fields for oil of the same gravity is substantially identical.

Suffice it to say that in view of our holding that the McCammon schedules were properly considered by the court, upon this phase of the case we hold that in reaching the finding here considered, the court was passing upon a question of fact; that there was sufficient evidence to sustain that finding of the court, and that we cannot say that such finding was clearly erroneous.

4. Whether the Determination of the Actual Market Value of Royalty Oil was Relevant and Material.

After deciding that the posted prices for Kettleman Hills oil during the 50 months period did not represent the true value of the oil, the court proceeded to determine that value and found that the oil produced at Kettleman Hills was for all practical purposes identical, gravity for gravity, with crude oil produced in the Santa Fe Springs field and that the prices posted and paid during the period in question for Santa Fe

crude provided a proper criterion for measuring the reasonable market value of Kettleman Hills crude oil during that period. The court found that because of differences in geographical location of the two fields, with consequent differences in cost of transportation to market, Kettleman Hills oil was worth 10¢ per barrel less than comparable Santa Fe Springs oil; the 10¢ differential being held reasonable and proper on account of different transportation costs. The court found that the market values of Santa Fe Springs oil varied directly and uniformly with the gravity of the oil. As Kettleman Hills oil extended over a broader range of gravities than that produced at Santa Fe Springs, the court extended the schedules of Santa Fe Springs prices during the 50 months period by extrapolation to cover the range of gravities produced at Kettleman Hills, and used the extended prices through application of the 10¢ differential mentioned to determine the values of the Kettleman Hills oil.

Both parties have assigned error in respect to this finding of the trial court.

The Government claims that when the market value of Kettleman Hills crude oil is related to the market value of Santa Fe Springs crude oil, the allowance for additional transportation costs in respect to Kettleman Hills oil should be 2¢ instead of 10¢ per barrel and therefore that the court should have found the true market value of Kettleman Hills oil to be 2¢ per barrel less than comparable gravities of Santa Fe Springs oil. This contention is based upon an assertion that oils from the two fields mentioned would find a common market at tidewater: Santa Fe Springs oil at San Pedro, and Kettleman Hills oil at Estero Bay and Avila, to which points pipe line connections were available. We shall have occasion to deal with the Government's contention in this respect hereafter.

Continental, on the other hand, has devoted a considerable portion of its argument in support of its contention that, so far as it is concerned, being a non-integrated defendant, a fair interpretation of the terms of the lease would disclose no obligation on its part to compute royalties

upon any basis other than the price actually received by Continental.

The record shows and the court found that there was no evidence to indicate that Continental in any manner participated in any rigging of the market or in any practices designed to establish posted prices below the reasonable or true values of the oil. Continental was obliged to sell the oil for what it could get. Our attention is called particularly to section 2(d) which provides that in the event the United States should elect to take its royalties in money, the Secretary of the Interior reserves the right to approve or disapprove the lessees' sales contracts for the disposition of oil and gas. It is said that this clause was inserted in the lease for the obvious purpose of permitting the United States to insist upon the lessee procuring a fair price for its oil. But by the same token, Continental argues, the lease discloses that it was contemplated that when the best possible sales contract had been procured, the Government must be satisfied with royalty settlements on that basis. It is argued that section 2(d) serves no useful purpose other than to protect the United States in this manner and its insertion in the lease is unmistakable evidence of the fact that the Secretary in promulgating this clause contemplated that royalty settlements would be made on the basis of the prices fixed by the sales contracts.

Our attention is called to the fact that the leases also contain other provisions for the protection of the Government. These include the provision that permits the Government to take its royalties in kind, in which case the Secretary is directed by section 36 of the Act, Title 30 U.S.C.A., § 192, to offer royalty oil for sale. This, it is argued, is a provision designed to protect the Government's royalty by providing a special means of determining the value of the royalty oil, namely, by sales, and Continental contends that the Secretary is limited in what he may do to protect the Government's royalty interests to procedures specified in the lease and in the Act. Continental therefore asserts that at least so far as it is concerned, it is immaterial and irrelevant whether the prices posted by the integrated companies were discriminatory or arbitrary and that Continental may not be charged with payment on any basis other than that at which it sold its oil under contracts which had been filed with the Secretary and which the Secretary did not disapprove.

We think the record indicates that when the leases were issued a situation of the kind which has here developed was not within the contemplation of the parties. So far as the Secretary is concerned, he doubtless considered that in reserving the right to approve or disapprove the proposed sales contracts he had inserted in the lease adequate means of protecting the Government against the effect of sales of oil at improvident prices. But when he first began to make the effort to collect additional royalty payments on account of production in this field, initially by his abortive effort to fix a minimum value for oil, he found himself compelled to deal with a situation for which no express provision had been inserted in the contract. He then determined that as against Continental nothing could be accomplished by an outright disapproval of Continental's proposed sales. His demands therefore were that notwithstanding Continental might be receiving the contract prices on the sale of its oil, it make royalty settlements on some other basis. This basis the trial court has held is not the minimum value order of the Secretary, but rather the market value as determined by the court through comparison with values in other fields.

We have previously called attention to the dearth of exact specifications in the leases as to how the percentages stated shall be applied. There are plenty of references to "5%", "12½", and to other percentages, but in those immediate connections the lease suggests to one reading it the question "5% of what?"

We have previously noted that the Leasing Act itself refers to royalty as a percentage "in amount or value of the production". We have also noted the references

in the lease to the term "value" such as those in Section 2(c)3.[5]

■ We are therefore of the opinion that the trial court was right in its interpretation of the leases as requiring royalty to be based upon actual, true or market value of the oil.[6] The circumstances here in which the non-integrated companies found themselves unable to sell for prices representing such values, but required nevertheless to account for royalty upon the basis of fair market values, have created a situation comparable to those which have sometimes arisen between parties to contracts who have asserted that their obligations have been altered or terminated through the operation of the doctrine of frustration by fortuitous circumstances. Cf. Williston on Contracts, Rev.Ed., §§ 1951–1954.

We have then a contract which in terms obligates the lessee to pay a stated percentage of the value of the production. This is an undertaking which the lessee assumed without any express limitation or qualification. Whatever the percentage may be, the lessee must in any event pay a sum calculated with respect to the true value.

■ The question here is whether this unexpected difficulty in regard to the marketing of oil produced by the non-integrated companies operates as an implied limitation upon or termination of this absolute obligation. The payment of royalty at the rate required by the district court's judgment is not an impossibility. At most it can be said to involve greater expense and to yield less profit than the lessee initially contemplated. "A promise will not be discharged, however, because the performance promised in return has lost value on account of supervening fortuitous circumstances unless they nearly or quite completely destroy the purpose both parties to the bargain had in mind." Williston on Contracts, Rev.Ed. Sec. 1954, page 5481.

A similar question arose in the case of Lloyd v. Murphy, 25 Cal.2d 48, 153 P.2d 47. In it the lessees leased certain premises for the purpose of conducting an automobile business, then vacated them and declined to pay further rent on the ground that government restrictions upon the automobile business during the period of the Second World War had operated as a commercial frustration of the lease and was an excuse for non-performance on the part of the lessee. In the course of an extensive discussion of the principles applicable to the defense of frustration, the court said, 25 Cal. 2d at page 51, 153 P.2d at page 51: "Nor has defendant sustained the burden of proving that the value of the lease has been destroyed. The sale of automobiles was not made impossible or illegal but merely restricted and if governmental regulation does not entirely prohibit the business to be carried on in the leased premises but only limits or restricts it, thereby making it less profitable and more difficult to continue, the lease is not terminated or the lessee excused from further performance."

■ The leases here bore evidence of the Government's concern lest those operators who owned or controlled pipe lines might thereby depress the market for oil produced and sought to be sold by others. By § 3(c) the Government reserved "the right to require the lessee, his assignees or beneficiary, if owner or operator of, or owner of a controlling interest in, any pipe line, or any company operating the same which may be operated accessible to the oil derived from lands under such lease, to accept and convey at reasonable rates and without discrimination the oil of the Gov-

---

5. "When paid in value such royalties shall be due and payable monthly on the 15th of each calendar month * * *."

6. Many common forms of leases are so drawn as to make "value" immaterial. Frequently the reference is to "posted available market price", or to "published price offered by major oil companies", Summers, Oil and Gas, Vol. 3, p. 429, Vol.

7, pp. 28, 36, 68. Cf. Security First Nat. T. & S. Bk. v. Loftus, 129 Cal.App. 650, 19 P.2d 297. In Shamrock Oil & Gas Corporation v. Coffee, 5 Cir., 140 F.2d 409, the term "market price", was held to refer to amounts actually paid in the same market, and not to mean "market value", or "fair market value" or "reasonable worth".

ernment or of any citizen·or company, not the owner of any pipe line, operating a lease or purchasing oil or gas under the provisions of this act." We do not suggest that there is evidence that Continental by availing itself of this reserved privilege could have avoided the hardship which the prices posted by the integrated companies placed upon it. Its significance is that it demonstrates that the problem of sales of oil at adequate prices was within the contemplation of the parties and that this was one of the risks which the lessees were obliged to take. Cf. Baetjer v. New England Alcohol Co., 319 Mass. 592, 66 N.E.2d 798, 803; [7] Canadian Industrial Alcohol Co. v. Dunbar Molasses Co., 258 N.Y. 194, 198, 179 N.E. 383, 384, 80 A.L.R. 1173.[8]

We think that when the leases were made the lessees assumed, as a matter of course that they would encounter no difficulty in selling their oil for what it was worth, and that the Secretary likewise assumed that his right to approve or disapprove proposed sales contracts, or to demand delivery of royalty in kind, would furnish adequate protection for the Government.

We are unable to perceive how the inclusion of these provisions in the lease or their inadequacy in the situation in which the parties found themselves when it appeared that the market had been rigged, has operated as a restriction or limitation upon the obligation of the lessee to account for royalty on the basis of the true values of the oil. Continental is not the first signatory of a contract to find that unanticipated subsequent events operated to lessen the value of its bargain.

5. Does the Evidence Sustain the Court's Finding of the Value of the Royalty Oil?

On the part of the United States it is contended that while it was proper for the district court to compare Santa Fe Springs oil with Kettleman Hills oil for the purpose of arriving at the market value of the latter, that the cost of the transportation factor should have been arrived at by comparing the cost of transportation of the two oils to shipping points at tidewater. The Government argues that during the period in issue, the California fields produced more crude oil than was consumed in the domestic areas tributary to them; that substantial amounts had to be exported, and that it was in the export or offshore market that the two oils met in close competition. Kettleman Hills was connected with tidewater by pipe line systems to Estero Bay, to Avila and to Monterey Bay. Santa Fe Springs had transportation by pipe line to San Pedro Bay. The Government points to evidence in the record tending to show that the difference in cost for such transportation from the two fields to market at tidewater was substantially two cents per barrel. From this the Government concludes that this two cents represents the difference in fair market value between the two crudes. The Government contends that what the trial court did in arriving at the 10¢ differential was to calculate the difference between the cost of transporting Kettleman Hills oil and the cost of transporting Santa Fe Springs oil to the Los Angeles market. Since the Los Angeles market was not a normal market for Kettleman Hills oil, which was near the San Francisco Bay refineries, the Government argues that the trial court in finding a 10¢ differential has adopted an erroneous concept of "phantom freight" and "Los Angeles plus", because the figures are calculated upon the assumption of a transportation which normally would not be made.

We think that the Government's argument is based upon a mistaken assumption as to what the trial court actually did.

7. "When the defendant contracted to take the molasses in its vessels it doubtless hoped for and may have expected the best, but it also knew the worst and, except for the limited protection of the 'Force Majeure' clause, took the risk."

8. "The inquiry is merely this, whether the continuance of a special group of circumstances appears from the terms of the contract, interpreted in the setting of the occasion, to have been a tacit or implied presupposition in the minds of the contracting parties, conditioning their belief in a continuing obligation." Williston on Contracts, § 1952, pp. 5472–5473.

We find no evidence in the findings or in the opinion that the court based its finding of transportation differential upon the assumption that Kettleman Hills oil would be transported to the Los Angeles basin. In its opinion the court said, 73 F.Supp. at page 263: "In arriving at the market value for Kettleman Hills oil, however, an allowance must be made for the difference in transportation costs. Here the court has recourse to the computations, and to the testimony of the witness McCammon for the cost differential between the two fields. The transportation costs were ten cents per barrel less at Santa Fe Springs than at Kettleman Hills. The court, therefore, concludes that the market value of Kettleman Hills crude oil from July 1, 1931, to August 29, 1935, was gravity for gravity the same as that of Santa Fe Springs, less ten cents per barrel."

The evidence indicated that the normal market for Kettleman Hills oil was in the San Francisco Bay area with transportation via pipe line and tanker. In our opinion it was proper for the court to consider the difference between the cost of transportation of Santa Fe Springs oil to Torrance, (near Los Angeles), and of Kettleman Hills oil to Richmond (on San Francisco Bay).

It is noted that the court referred to McCammon's computations in arriving at that cost differential. If the McCammon computations are not competent evidence as against the appellants upon this point because of the second-hand character of McCammon's information, so far as the United States is concerned, it is in no position to question the showing in these computations of a 10¢ cost differential when the Government offered them as evidence for this very purpose.

We think the record does not disclose that the case was tried upon the theory that Kettleman crude and Santa Fe Springs crude actually met a competitive market at these tidewater points; but even if there were substantial evidence of movements of that character which would have sustained the finding of fact upon the Government's present theory, we think the Government's argument under this speci-

fication of error is essentially an attempt to re-argue the facts which it was the duty of the trial court to resolve, and whose findings it is our duty not to disturb in the absence of a showing that they were clearly erroneous.

Appellants' briefs contain the same error we find in the Government's briefs on this point in assuming that the court based its determination of a differential upon the assumption that Kettleman Hills oil would be transported to the Los Angeles basin. Appellants undertook to show that the pipe line charge from Kettleman Hills to Los Angeles was 16¢ per barrel, which, added to a one cent gathering charge and 64/100ths of a cent tax, would make a total of 17.64¢. It is argued that this is not shown to represent the differential, but that this calculation overlooks the fact that a similar computation of transportation costs from Santa Fe Springs would amount to 6.24¢ per barrel, the difference even on these figures being 11.04¢. However, the court was not obliged to base its finding of fact upon any single calculation. There was plenty of evidence elsewhere in the massive record before the court to indicate a differential of even less than 10¢. Samples of such evidence may be found not only in the evidence as to differential in transportation for offshore shipments of oil for sales abroad, upon which the Government has placed so much emphasis, but also in General Petroleum's own exhibit No. 7 which contains a sheet bearing date December 6, 1935, disclosing differentials in transportation, storage and refining costs between Santa Fe Springs and Kettleman. This shows book costs for Santa Fe Springs oil of 10.55¢ per barrel and for Kettleman Hills oil of 18.61¢, or a difference of 8.06¢.

We find no merit in appellant's argument that the court was not justified in calculating the value of the higher oil gravities at Kettleman Hills by a process of extrapolation. There was substantial evidence that the value of the marketable constituent elements of crude generally increases in direct proportion to the gravities of the oil. Likewise without merit we think the argument that General suffered

a disadvantage in the practice of the manager for Kenda in so mixing the oil from Kettleman Hills products as to take advantage of the breaks in the posted price brackets. It is asserted that from thus delivering oil which would barely top the breaking point, the result was that by reason of evaporation and other losses the oil on reaching its destination had dropped to a lower gravity bracket to the disadvantage of General. We take it that there is no dispute that notwithstanding the sketchy character of the leases, royalties were to be calculated at values at the wells, not at the pipe line destination, and we think the court was not obliged to take into consideration the factors here mentioned.

It is our opinion that the argument on the part of appellants with respect to value is, like that of the Government, but an effort to reargue to us questions which were properly for the decision of the trial judge whose findings we think were abundantly supported by the evidence in the record.

6. The Demand for Royalties Based Upon the Secretary's Orders Fixing the Values of Gas and Casing-Head Gasoline.

One of the orders here in question is contained in a letter dated June 4, 1931, reciting that settlements on gas in California had been "fixed at 5¢ per 1000 cubic feet and on natural-gas gasoline in Kettleman Hills at 6¢ below the current published San Francisco price for gasoline in tank wagon lots, exclusive of tax." This order, as it related to natural-gas gasoline, was modified by order of June 23, 1931, which provided that effective July 1, 1931, the minimum price per gallon of natural-gas gasoline in the field where produced shall be based on the average service station price, exclusive of tax, for gasoline of standard quality at Standard and Shell stations, in the metropolitan area of San Francisco and Los Angeles, as determined daily in accordance with the formula set out in italics, 73 F.Supp. at pages 232 and 233 of the district court's opinion.

On June 7, 1937, the Secretary directed that royalties be computed "on natural gas, including its derivative products" by one of two alternative methods described in the letter, "whichever may result in the higher valuation". This is referred to as the "net realization order of 1937". As pointed out in the trial court's opinion, 73 F.Supp. at page 255, the 1926 Regulations, § 4(d), had allowed the lessee two-thirds of the natural-gas gasoline extracted from gas as an arbitrary allowance for the cost of manufacture; and the Government had collected its royalty on the value of the remaining one-third. Prior to June 7, 1937, the lessees had taken advantage of the two-thirds allowance, but had refused to recognize as valid the Secretary's determination of the value of the natural-gas gasoline. In the order in question the Secretary found that the two-thirds-one-third allocation was "palpably erroneous", because of improved processing equipment and methods. Accordingly, it was ordered that the lessee "should be required to pay his natural gas royalties upon the basis of the actual money value of such gas to him in the field whenever such actual values exceed valuations arrived at by using in the Sec. 4(d) formula the prices for dry gas, casing-head gasoline and drip gasoline as fixed by the Secretary of the Interior." Accordingly the administrative officials were required to charge the lessees "royalty either on the basis of the combined value of such products, as measured by the lessee's gross field realization less his actual extraction cost (net field realization value), or on the basis of section 4(d) formula, whichever may result in the higher valuation".

Appellants have attacked these gas and casing-head gasoline orders on the grounds (1) that the Mineral Leasing Act did not either at all or in a valid manner authorize the insertion in the leases of a provision authorizing the Secretary to fix the values of gas and casing-head gasoline for royalty purposes. (2) That even if such power were granted to the Secretary, he could exercise it only after notice and hearing and compliance with other requirements of procedural due process. (3) That the orders, as made, were unauthorized because unreasonable, arbitrary, capricious and inequitable. (4) That the net realization order

was not a determination of value but a bare attempt to modify the terms of the existing leases.

The trial judge considered and discussed the arguments here made in that portion of his opinion beginning with the last paragraph on page 249 through page 258 (73 F.Supp. 249–258). The court upheld the validity of the net realization order insofar as it related to production after that date, but declined to sustain it with respect to natural gas produced prior to the date of the order. The Government attacks this limitation insofar as it applies to these appellants on the ground that when the order was made these lessees had not complied with the previous orders of the Secretary and had not paid the royalties as billed. The Government therefore argues that since the accounts remained open the Secretary had the right to recompute and rebill for the prior production for which settlement had not been made in accordance with the previous bills.

■ We find no reason to add to the length of this opinion by a repetition of what the trial judge has so ably expressed in this portion of his opinion. As to whether the Secretary was authorized to insert a reservation of the power to determine and fix such values, we think the question is answered on the authority of United States v. Ohio Oil Co., 10 Cir., 163 F.2d 633, 640.[9] As for the argument that the Act does not contain sufficient specification of standards for the determination of such values, we agree with what the trial court has said, and we also think that for the reason stated in United States v. San Francisco, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050, as the lessees have accepted leases expressly reserving this right to the Secretary, they are not in a position to question the sufficiency of the Act on this ground.[10]

■ The leases which General and Continental have signed and accepted contain the express delegation to the Secretary of the power to fix the value of gas for royalty purposes. Similar contract provisions have been enforced by the courts. (See cases in footnote, United States v. Beuttas, 324 U.S. 768, at page 772, 65 S.Ct. 1000, 89 L.Ed. 1354. In this situation there is no rule requiring notice or hearing as prerequisite to the order, but the determination is valid in the absence of fraud or mistake so gross as to imply bad faith. It may well be said that the net realization order was not only an exercise of the Secretary's reserved power to determine the value, but that it was altogether reasonable for him to conclude that the gas was worth what the lessees were able to realize therefrom.

■ In our opinion the net realization order was made in an effort to carry out the Secretary's duty to collect royalty on the basis of value, and it was a proper exercise of the Secretary's reserved power to determine value for royalty purposes.

■ As for the Government's claim that the Secretary might recompute the gas royalties owing where lessees had not paid the bills previously rendered, in other words, make his June 7, 1937, order retroactive, we think the court correctly construed the provision of the lease permitting the Secretary to fix the value of gas for royalty purposes as operating prospectively only. Statutes are always so construed. Cf. Neild v. District of Columbia, 71 App. D.C. 306, 110 F.2d 246, 254. We think that a contract provision as extraordinary as is this authorization to fix values, should no less be interpreted as having prospective operation only.

### 7. Interest.

The court's conclusion as to interest was as follows: "Plaintiff is entitled to recover from the several defendants interest by way

9. "The parties were free to contract with respect to the subject matter, and there is nothing in their agreement which we can say is at variance with the enabling legislation or repugnant to public policy."

10. "After passage of the Bill the City accepted the grant by formal ordinance, assented to all the conditions contained in the grant, constructed the required power and water facilities and up to date has utilized the rights, privileges and benefits granted by Congress. Now, the City seeks to retain the benefits of the Act while attacking the constitutionality of one of its important conditions."

of damages for delay in payment, the same to be computed on the following bases: (1) Because of delay in filing the action plaintiff is allowed no interest prior to the date of suit. (2) Interest is allowed against all of the defendants * * * from date of suit to the date of judgment on plaintiff's recoveries on the gas and gasoline accounts. (3) Interest is allowed against the integrated defendants from the date of suit to the date of judgment on plaintiff's recoveries on the crude oil accounts. (4) No interest is allowed against the non-integrated defendants upon plaintiff's recoveries on the crude oil accounts as it does not appear that such non-integrated defendants had the use of the money upon which interest is sought. * * * (6) The rate of interest allowed prior to judgment is fixed at 4% per annum as the Court finds that that rate is fairly compensatory."

 The parties are in disagreement as to what law governs an award of interest here. General and Continental assert that California law controls, and for this cite Mason v. United States, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396; Jeems Bayou Club v. United States, 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402 and Eustis v. Martin, 5 Cir., 122 F.2d 648. Proceeding from this premise they urge that the rule laid down in Lineman v. Schmid, 32 Cal.2d 204, 195 P. 2d 408, 412, 4 A.L.R.2d 1380, governs here. The rule of that case, construing Civil Code, § 3287,[11] is that "interest is not allowable where the damages depend upon no fixed standard and cannot be made certain except by accord, verdict or decree". Accordingly, it was held that where the damages were not "capable of ascertainment by calculation", or could not "be determined by reference to well-established market values", but were based "on a value which [the court] was compelled to select from conflicting evidence relating to the factors of cost, carrying charges and profit", it was improper to add interest. Such, it is said, is the situation.

On the part of the Government it is said that the state statute or local common law does not govern. We are asked to examine Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361, where it was said: "But the rule governing the interest to be recovered as damages for delayed payment of a contractual obligation to the United States is not controlled by state statute or local common law. In the absence of an applicable federal statute it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for non-payment of the amount found to be due."

As far as the sums recovered on account of royalties on gas and casing-head gasoline are concerned, since the amounts found owing were fixed and ascertainable, we think the award of interest was justified under either rule.

As for the interest allowed against General on the crude oil account recoveries, we think that under the California rule interest would not be recoverable. But we think that rule not obligatory here for the reasons stated in Royal Indemnity Co. v. United States, supra.

 It is our view that it was for the trial court to determine as a question of fact the amount of the Government's loss on this item. We think it was a situation such as that discussed in Miller v. Robertson, 266 U.S. 243, at page 258, 45 S.Ct. 73, at page 78, 69 L.Ed. 265, where the court said: "Generally, interest is not allowed upon unliquidated damages. * * * But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages."

 The rule permitting an award of interest "in the discretion of the court" is one of general recognition. Restatement of the Law of Contracts, § 337(b). Such a discretion, in a proper case, may be that of

11. § 3287, Cal.Civ.Code, provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt."

judge or of jury, but like other questions of the amount of damages, it is a question for the trial court, and it is its discretion that has been exercised here. We are not permitted to disturb it, for we think the court might properly conclude that the Government could not otherwise be made whole in respect to what it lost on account of deficiencies in the payments for crude oil royalties.

█ General also complains of unconscionable delay in bringing suit. But in this contention it has prevailed, for the court awarded no interest for any period prior to suit. Although the Government assigns error in respect to such action, we find no fault with what the court did in this respect.

The judgment is affirmed.